1  Kevin S. Rosen (SBN 133304)
   krosen@gibsondunn.com
2  Matthew S. Kahn (SBN 261679)
   mkahn@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   555 Mission Street
4  San Francisco, CA 94105
   Telephone: (415) 393-8212
5  Facsimile: (415) 374-8466

6  *Specially Appearing for DLA Piper LLP (US)*

7              **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
8                    **OAKLAND DIVISION**

9

10 BOARD OF TRUSTEES OF LELAND          No. 4:19-CV-02904-JST
   STANFORD JUNIOR UNIVERSITY,
11                                      **STIPULATION AND [PROPOSED]**
                          *Plaintiff*,   **ORDER TO TEMPORARILY STAY**
12                                      **PROCEEDINGS PENDING NINTH**
                vs.                     **CIRCUIT'S DECISION ON PETITION**
13                                      **FOR WRIT OF MANDAMUS**
   ZHANG YUZHEN, an individual; FAN
14 MIAO, an individual; FAN MAO, an     Hon. Jon S. Tigar
   individual; and all persons unknown, claiming
15 any legal or equitable right, title, estate, lien,
   or interest in the property described in the
16 complaint adverse to plaintiff's title, or any
   cloud upon plaintiff's title thereto,
17
18                        *Defendants*.

19 ─────────────────────────────────
   YUZHEN ZHANG, an individual,
20
                          *Counterclaimant*,
21
                vs.
22
   THE BOARD OF TRUSTEES OF THE
23 LELAND STANFORD JUNIOR
   UNIVERSITY; and LI NANYANG, an
24 individual,
25
                        *Counterdefendants*.
26

27

28

Under Local Rule 7-12, the parties stipulate to, and respectfully request that this Court enter, a temporary stay of proceedings in this Court pending the Ninth Circuit's decision on Yuzhen Zhang's petition for a writ of mandamus.

The basis for the stipulation is as follows:

1. On March 6, 2023, the Court entered an order disqualifying DLA Piper LLP (US) from representing Ms. Zhang.  Dkt. 118.

2. On March 16, 2023, the Court entered an order in which it continued the case management conference scheduled for March 21, 2023 to May 23, 2023 and set a deadline of May 16, 2023 for filing "[u]pdated case management statement(s)."  Dkt. 121. In that order, the Court stated that "[i]f no attorney has entered an appearance for Defendant Zhang by May 16, 2023, the Court will assume that she intends to represent herself in this proceeding, and she is then ordered to appear personally at the May 23 case management conference."  *Id.*

3. On May 9, 2023, Ms. Zhang filed in the Ninth Circuit a petition for a writ of mandamus challenging this Court's disqualification order.  In that petition, she explains that disqualification orders are not appealable and that her only meaningful avenue for relief is a writ petition.  She also argues that this Court's order is incorrect and presents an important and recurring question of law that the Ninth Circuit should address.  A copy of the petition is attached to this stipulation as Exhibit A.

4. It would promote judicial efficiency to defer proceedings in this matter, including the May 23, 2023 case management conference and the May 16, 2023 deadline for filing updated case management statement(s), until the Ninth Circuit determines whether Ms. Zhang can continue to be represented by DLA Piper LLP (US) in this matter or will instead need to engage replacement counsel or to represent herself.

5. The parties cannot predict when the Ninth Circuit will rule on the petition, so a temporary stay pending the Ninth Circuit's decision makes more sense than a continuance, for a specific number of days, of any existing deadlines and hearing dates, including the date for the upcoming case management conference.

Accordingly, the parties stipulate and agree that:

a. the proceedings in this case should be stayed pending the Ninth Circuit's decision on Ms. Zhang's petition for a writ of mandamus and, in particular, the May 23, 2023 case management conference and the May 16, 2023 deadline for filing updated case management statement(s) should be vacated;

b. if the Ninth Circuit denies the writ petition, Ms. Zhang should have 60 days from the date of the order denying the petition to find replacement lawyers and to notify both Stanford and the Court of the names and contact information of those lawyers;

c. if the Ninth Circuit denies the writ petition, the case management conference should be continued until the earlier of (i) 20 days after Ms. Zhang notifies Stanford and the Court of the names and contact information of her replacement lawyers or (ii) in the event that Ms. Zhang does not notify Stanford and the Court of the names and contact information of her replacement lawyers within 60 days from the date of the order denying the petition, within 80 days after the date of the order denying the petition; and

d. if the Ninth Circuit grants the writ petition, the case management conference should be continued until 20 days after the date of the order granting the petition.

DATED:  May 9, 2023          By:  _____
                                  MATTHEW S. KAHN
                                  GIBSON, DUNN & CRUTCHER LLP
                                  *Specially Appearing for DLA Piper LLP (US)*


                             By:   */s/ Mark D. Litvack*
                                  MARK D. LITVACK
                                  PILLSBURY WINTHROP SHAW PITTMAN LLP
                                  *Attorneys for The Board of Trustees of the Leland*
                                  *Stanford Junior University and Li Nanyang*


                             By:   */s/ Yuzhen Zhang*
                                  YUZHEN ZHANG

## LOCAL RULE 5-1(h) ATTESTATION

Under Local Rule 5-1(h)(3), I attest that each of the other signatories to this stipulation

concurs in the filing of this document.

_____

MATTHEW S. KAHN

STIPULATION AND [PROPOSED] ORDER TO TEMPORARILY STAY PROCEEDINGS PENDING NINTH
CIRCUIT'S DECISION ON PETITION FOR WRIT OF MANDAMUS, NO. 4:19-CV-02904-JST

1

**[PROPOSED] ORDER**

2

PURSUANT TO THE STIPULATION, IT IS SO ORDERED.

3

4

Dated: _____

5

6
_____
The Honorable Jon S. Tigar
United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND [PROPOSED] ORDER TO TEMPORARILY STAY PROCEEDINGS PENDING NINTH
CIRCUIT'S DECISION ON PETITION FOR WRIT OF MANDAMUS, NO. 4:19-CV-02904-JST

# EXHIBIT A

No. __-_____

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

IN RE YUZHEN ZHANG

_____

YUZHEN ZHANG,

*Defendant-Petitioner*,

v.

BOARD OF TRUSTEES OF LELAND

STANFORD JUNIOR UNIVERSITY,

*Plaintiff-Respondent.*

_____

On Appeal From the United States District Court
for the Northern District of California
Case No. 4:19-cv-02904-JST | The Honorable Jon S. Tigar

_____

**PETITION FOR WRIT OF MANDAMUS**

_____

Charles L. Deem
DLA PIPER LLP (US)
4365 Executive Drive
San Diego, CA 92121-2133
(619) 699-2978

*Attorneys for Defendant-Petitioner Yuzhen Zhang*

**TABLE OF CONTENTS**

Page

INTRODUCTION..............................................................................................1

ISSUE PRESENTED .........................................................................................4

BACKGROUND................................................................................................4

I.    Stanford sues Yuzhen Zhang, the widow of a prominent Chinese
      politician, to secure control of her late husband's diary and other
      personal papers. ..........................................................................................4

II.   Ms. Zhang hires Matthew Jacobs to represent her. ....................................6

III.  Mr. Jacobs moves to DLA Piper with the intent of continuing to lead
      the representation of Ms. Zhang and passes multiple conflict checks. .........6

IV.   Stanford contends that DLA Piper's representation of Ms. Zhang
      presents a conflict, which is quickly resolved................................................7

V.    Despite the conflict's quick resolution, Stanford moves to disqualify
      DLA Piper from continuing to represent Mr. Jacobs' longtime client,
      Ms. Zhang. ..................................................................................................11

VI.   The district court issues an order disqualifying DLA Piper from
      representing Ms. Zhang based on "automatic disqualification" and
      "vicarious disqualification" rules................................................................12

RELIEF SOUGHT.............................................................................................13

STANDARD OF REVIEW ................................................................................14

ARGUMENT....................................................................................................15

I.    The Court should issue a writ of mandamus directing the district
      court to vacate its order disqualifying DLA Piper. ......................................15

A.     A writ is Ms. Zhang's only means to obtain relief...........................16

B.     Ms. Zhang will be severely prejudiced if she cannot obtain writ relief. ............................................................................................17

C.     The district court's reliance on "automatic" and "vicarious" disqualification rules was clearly erroneous. ....................................20

D.     The district court's order raises a novel and important issue that would repeatedly evade review absent mandamus. .................28

II.   In the alternative, the Court should certify the issue presented to the California Supreme Court and stay the case. ...............................34

CONCLUSION ........................................................................................37

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Am. Cable Publ'ns, Inc.*,
768 F.2d 1194 (10th Cir. 1985) ........................................................................18

*Cal. Self-Insurers' Sec. Fund v. Superior Court*,
19 Cal. App. 5th 1065 (2018) ..........................................3, 27, 28, 29, 32, 33, 37

*In re Cement Antitrust Litig.*,
688 F.2d 1297 (9th Cir. 1982) ....................................................................17, 33

*Chambers v. Superior Court*,
121 Cal. App. 3d 893 (1981) ........................................................ 19, 20, 26, 31

*Christensen v. U.S. Dist. Court*,
844 F.2d 694 (9th Cir. 1988) ....................................................................4, 18, 19

*Cohen v. U.S. Dist. Court*,
586 F.3d 703 (9th Cir. 2009) ............................................................................19

*In re County of Los Angeles*,
223 F.3d 990 (9th Cir. 2000) ........................................................ 20, 22, 27, 38

*People ex rel. Department of Corporations v. SpeeDee Oil Change
Systems, Inc.*,
20 Cal. 4th 1135 (1999) ............................................................................26, 30

*Douglas v. U.S. Dist. Court*,
495 F.3d 1062 (9th Cir. 2007) ..........................................................................16

*Flatt v. Superior Court*,
9 Cal. 4th 275 (1994) ......................................................................................25

*Forrest v. Baeza*,
58 Cal. App. 4th 65 (1997) ........................................................................25, 29

*Kirk v. First Am. Title Ins. Co.*,
183 Cal. App. 4th 776 (2010) ..............3, 19, 27, 28, 30, 31, 32, 33, 38, 39, 40, 41

*Murray v. BEJ Minerals, LLC*,
924 F.3d 1070 (9th Cir. 2019)..............................................................................39

*Reilly v. Comp. Assocs. Long-Term Disability Plan*,
432 F. Supp. 2d 5 (E.D.N.Y. 2006)......................................................................37

*Richardson-Merrell, Inc. v. Koller*,
472 U.S. 424 (1985)............................................................................................18

*In re Shared Memory Graphics LLC*,
659 F.3d 1336 (Fed. Cir. 2011) .....................................................................18, 19

*Solow v. W.R. Grace & Co.*,
83 N.Y.2d 303 (1994) .........................................................................................41

*State Farm Mutual Automobile Insurance Co. v. Federal Insurance Co.*,
72 Cal. App. 4th 1422 (1999)..........................................................................23, 24

*United States v. Miller*,
624 F.2d 1198 (3d Cir. 1980)..............................................................................25

*Valenzuela–Gonzalez v. U.S. Dist. Court*,
915 F.2d 1276 (9th Cir. 1990).............................................................................16

*Wyeth v. Abbott Labs.*,
692 F. Supp. 2d 453 (D.N.J. 2010) ...............................................25, 36, 37, 38

**Other Authorities**

Amanda Roberts, *Working Remotely Is Now a Top Priority, Says New ABA Report Highlighting Lasting Shifts in Practice of Law*, ABA Journal (Sept. 28, 2022) ......................................................................34

Andrew Maloney, *Big Law Continues to Favor Transfers Over Entry-Level Associates*, ALM (Mar. 13, 2023),
https://tinyurl.com/2p8jnz7v ...........................................................................36

Cassandra B. Robertson, *Conflicts of Interest and Law-Firm Structure*,
9 St. Mary's J. on Legal Malpractice & Ethics 64, 72 (2018)...........................34, 35

James B. Kobak, Jr., *Dealing with Conflicts and Disqualification Risks*
     *Professionally*, 44 HOFSTRA L. REV. 497, 499–500 (2015) ....................................36

Mark T. Drooks & Jessica S. Chen, *Judicial Discretion Advised: A*
     *Critique of California's* Per Se *Disqualification Rule in Concurrent*
     *Representation Cases*, 26 CAL. LITIG. 25, 27 (2013) ............................................34

Sara Merken, *Big Law Firms Quicker to Merge in 2023 So Far, Report*
     *Shows*, Reuters (Apr. 4, 2023), https://tinyurl.com/2p8zu5cp .........................35

**Rules**

Cal. R. Prof. Conduct 1.7 cmt. 1 ...........................................................................25

**INTRODUCTION**

This petition presents this Court with an opportunity to address an important question that arises frequently in this era of increasingly large law firms, law-firm mergers, and lateral-partner moves:  If a law firm represents client A in litigation against client B, and also represents client B in unrelated matters, does that adverse concurrent representation *automatically* require the entire firm's disqualification, even if it was unintentional, was quickly corrected, caused no harm, and involved different lawyers in different offices of the firm?  In deciding that the answer was yes—and therefore declining to consider *any* facts or circumstances weighing against disqualification—the district court misapplied California law and caused severe prejudice that cannot be corrected except through writ relief.

Yuzhen Zhang has been fighting the Hoover Institution, a think tank that is part of Stanford University, for nearly four years over ownership of the historically significant papers of her late husband, Li Rui, who was an important figure in Chinese politics for decades.  A Chinese court decided the papers belong to Ms. Zhang, who wants to donate them to a Chinese museum.  Hoover didn't like the judgment in China and wants the papers for itself, so it sued Ms. Zhang (through Stanford) in the United States.  Ms. Zhang's lawyer in that years-long fight has been Matthew J. Jacobs, who moved his practice to DLA Piper in the middle of the case.

1

When he did, Stanford moved to disqualify him and every other lawyer at DLA Piper because, for a short time and unbeknownst to Mr. Jacobs, DLA Piper had also been jointly representing Stanford and another company in an unrelated and essentially inactive patent prosecution. The district court granted the motion, applying an inflexible approach to disqualification that is out of step with California law and that will cause Ms. Zhang severe prejudice.

In reaching its decision, the district court applied two bright-line rules that, together, are inconsistent with modern legal practice and not required by California disqualification law or this Court's precedent: (1) a rule of automatic disqualification whenever a law firm has concurrently represented a client who is directly adverse to another client of the firm, regardless of how long the adverse concurrent representation lasted or any other extenuating circumstances; and (2) a rule of vicarious disqualification—that an entire law firm must be disqualified if even one attorney in the firm has a conflict of interest, again with no consideration of the context. The district court refused to consider any mitigating circumstances, including that no confidences were breached, no work was done on behalf of either client for the brief duration of the conflict, or that disqualification would significantly prejudice Ms. Zhang.

The district court's inflexible approach to disqualification is inconsistent with California law.  More than once the California Court of Appeal has overturned orders disqualifying law firms under a similarly absolutist test that leaves no room for the facts of each case.  *Cal. Self-Insurers' Sec. Fund v. Superior Court*, 19 Cal. App. 5th 1065 (2018); *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776 (2010). This Court should follow those decisions and hold that disqualification motions must be addressed in a holistic, fact-dependent way, with some awareness of the severe burdens to a client caused by the loss of a longtime attorney—and of the possibility that the party moving for disqualification may be doing so for purely tactical reasons rather than because of any actual breach of the duties of confidentiality or loyalty.  Only by investigating the facts can courts protect the rights of *all* clients when deciding disqualification motions.

This petition is Ms. Zhang's only way to win relief from the district court's erroneous decision.  Disqualification orders aren't directly appealable; for that reason, courts of appeals have consistently held that writ relief is the only means of challenging them.  *E.g.*, *Christensen v. U.S. Dist. Court*, 844 F.2d 694, 697 (9th Cir. 1988).

Disqualification orders also often, as in this case, cause severe prejudice to the clients of the disqualified lawyers.  Ms. Zhang is a 93-year-old widow in poor

3

health.  She has been litigating this case for nearly four years with her chosen

counsel, Mr. Jacobs, who has experience litigating complex cross-border disputes,

including for Chinese clients.  Now, she faces the prospect of having to find new

lawyers—who are unlikely to have Mr. Jacobs's expertise and who will have to

devote significant resources to getting up to speed in a complicated case.

There is no good reason for this result.  Courts and commentators alike have

for years lamented needlessly punitive disqualification orders that serve only to

deprive clients of their chosen counsel.  The Court should grant this petition, vacate

the disqualification order, and direct the district court to reassess Stanford's

motion to disqualify DLA under a fact-dependent standard accounting for all the

mitigating circumstances and the underlying purposes of the disqualification rules.

## ISSUE PRESENTED

Should the Court issue a writ of mandamus directing the district court to

vacate its order disqualifying DLA Piper and to apply a different standard

accounting for the totality of the circumstances?

## BACKGROUND

**I.      Stanford sues Yuzhen Zhang, the widow of a prominent Chinese politician, to secure control of her late husband's diary and other personal papers.**

Yuzhen Zhang is the 93-year-old widow of Li Rui, an influential Chinese

statesman and activist.  Dkt. 44-1 at 20.  Mr. Li played a significant role in Chinese

government, having served as a senior Chinese Communist Party official and even as Mao Zedong's personal secretary. *Id*. at 4–5. He later became an outspoken critic of the Party and advocated for political reform. Dkt. 1 at 3. Mr. Li catalogued his remarkable life in diaries, letters, photographs, and other materials. Mr. Li's papers chronicled important events in Chinese history; they also reflected what was going on in his personal life, including his relationships with his family. Dkt. 44-1 at 20. Mr. Li died intestate in February 2019.

In April 2019, Ms. Zhang commenced a court proceeding in Beijing, China, where she resides, to confirm her ownership of her late husband's personal papers. Dkt. 44-1 at 2–3, 22. But unbeknownst to Ms. Zhang, Mr. Li's daughter from another marriage had since removed the papers from China and taken them to the United States. *Id*. at 21. The daughter claimed that Mr. Li's materials belonged to her instead, and that she wished to share them with the Hoover Institution, a unit of Stanford. *Id*; Dkt. 1 at 2. In May 2019, Hoover (through Stanford) sued Ms. Zhang in California federal court, claiming it was the true owner of the papers. Dkt. 1.

A few months later, the Chinese court issued a judgment recognizing Ms. Zhang's rightful ownership of her late husband's papers. Dkt. 73-1 at 6–7; Dkt. 44-1 at 16, 37. Though Stanford was named as a third party eligible to participate in the proceeding, it decided not to. Dkt. 30 at 7. Even though the Chinese court had

issued a final judgment, Dkt. 73-1 at 6–7, Stanford continued its suit against Ms. Zhang in the United States.  Dkt. 44-1 at 25.  It also retained possession of Mr. Li's papers.  *Id*.

## II.    Ms. Zhang hires Matthew Jacobs to represent her.

After Stanford sued her, Ms. Zhang looked for the right lawyer to represent her in the fight over her late husband's papers.  She decided to hire Matthew Jacobs, then of Vinson & Elkins.  Mr. Jacobs is a former federal prosecutor who has substantial experience representing Chinese clients.  Dkt. 95-1 ¶ 3.  He has served as lead counsel representing Ms. Zhang from the outset of the case, devising the legal strategy, leading fact development, and coordinating with Ms. Zhang's attorneys in China.  *Id*. ¶¶ 4–6.  The strategy included filing counterclaims against Stanford for, among other things, conversion, intentional infliction of emotional distress, and public disclosure of private facts.  Dkt. 44-1 at 25–38.  Since his retention by Ms. Zhang, Mr. Jacobs has spent over 500 hours working on Ms. Zhang's case.  Dkt. 95-1 ¶ 5.

## III.    Mr. Jacobs moves to DLA Piper with the intent of continuing to lead the representation of Ms. Zhang and passes multiple conflict checks.

On February 15, 2022, Mr. Jacobs left Vinson & Elkins to join DLA Piper in its San Francisco office.  Dkt. 95-1 ¶ 10.  Before his move, Mr. Jacobs informed DLA Piper of the clients he intended to continue representing at his new firm, including

Ms. Zhang.  He advised DLA Piper that Stanford was adverse to Ms. Zhang so that DLA Piper could run a conflicts check.  *Id.* ¶ 8.  The firm's search did not identify any potential conflicts arising out of Mr. Jacobs's representation of Ms. Zhang.  *Id*. ¶ 9.

Mr. Jacobs's move required that the files for his ongoing cases, including Ms. Zhang's, be transferred from Vinson & Elkins to DLA Piper.  Dkt. 95-1 ¶ 11.  Until that transfer was complete, Mr. Jacobs couldn't open a new matter at DLA Piper for Ms. Zhang's representation or perform any substantive work on her case.  *Id*. Upon receipt of the full case file on March 7, 2022, Mr. Jacobs submitted a business-intake form for his representation of Ms. Zhang through DLA Piper's new-matter system.  That submission triggered a second conflicts check, which yielded the same result: no potential conflicts.  *Id*.

## IV.    Stanford contends that DLA Piper's representation of Ms. Zhang presents a conflict, which is quickly resolved.

After DLA Piper received Ms. Zhang's case files and ran both conflicts checks, Mr. Jacobs emailed Stanford's counsel on March 11, 2022.  Dkt. 95-2.  He told them he had changed firms and requested a meeting to discuss a discovery dispute between the parties.  *Id*.  Mr. Jacobs received no response, so he followed up with Stanford's counsel a few days later.  Dkt. 95-3.

The day after his second email, on March 17, 2022, Mr. Jacobs received a letter from Stanford's counsel addressed to him and another DLA Piper lawyer he'd

never met, Dr. Lisa Haile, a patent lawyer in a different office.  Dkt. 95-4.  The letter alleged a conflict of interest stemming from DLA Piper's representation of Stanford in an unrelated patent prosecution matter.  *Id*.

Unbeknownst to Mr. Jacobs, DLA Piper had been retained four years before to perform patent-related work jointly for two clients:   Stanford and a pharmaceutical company, CuraSen Therapeutics, that was licensing some Stanford technology.  Dkt. 95-6 ¶¶ 9–12; Dkt. 88-2.  DLA Piper's joint representation of Stanford and CuraSen was governed by an engagement agreement and a billing agreement.  Dkt. 95-6 ¶¶ 4–8; Dkt. 88-3.  The engagement agreement explained that DLA Piper's representation would "terminate upon conclusion of the Firm's active involvement in this matter," "whether or not we send you a letter to confirm such termination."  Dkt. 88-9 § 10.  The billing agreement made clear that DLA Piper's point of contact would be CuraSen, not Stanford:  DLA Piper would "interact directly with [CuraSen] on all patent prosecution matters," and CuraSen would be "responsible for the payment of all charges and fees" from DLA Piper related to its patent work.  Dkt. 95-6 ¶¶ 14–17.

CuraSen, did, in fact, pay all of DLA Piper's fees, and Stanford "largely deferred to CuraSen" on strategic issues. Dkt. 95-6 ¶¶ 20–21. DLA Piper's internal records inadvertently listed only CuraSen as the "client" on this matter, which is

why the two conflicts checks discussed above did not identify Stanford as a DLA Piper client.  Dkt. 95-15 ¶ 6.

DLA Piper performed a modest amount of work for CuraSen and Stanford until early 2022, when the representation had dwindled to just a few remaining patent applications.  Dkt. 95-6 ¶¶ 19, 37.  DLA Piper didn't bill any time to the case after February 8, 2022—*before* Mr. Jacobs joined the firm.  *Id*. ¶ 35.  On March 31, 2022, *CuraSen* told Stanford it was terminating the parties' license agreement, thus automatically ending DLA Piper's joint representation of both clients (because the subject of the joint relationship—CuraSen's work on the licensed technology—was concluded).  *Id*. ¶ 31.  In other words, *DLA* did *not* terminate its representation of Stanford on the matter.

When Mr. Jacobs received the March 17, 2022 letter from Stanford's counsel alleging a conflict of interest, the only work he had done for Ms. Zhang at DLA Piper was sending the scheduling emails to Stanford's counsel and asking a handful of DLA Piper lawyers to join him on the case once it started back up.  Dkt. 95-1 ¶ 16.  After receiving the March 17 letter, Mr. Jacobs immediately stopped working for Ms. Zhang so DLA Piper could investigate the alleged conflict.  *Id*. ¶ 17.

That same day, the DLA Piper patent lawyer, Dr. Haile, emailed Yi-An Chen in Stanford's Office of General Counsel, informing Ms. Chen that DLA Piper had hired

9

"a new lateral partner," Mr. Jacobs, "who has been representing Yuzhen Zhang adverse to Stanford."  Dkt. 88-10 at 4.  Dr. Haile requested that Ms. Chen "waive any potential conflict of interest" arising from that representation, as it was "completely unrelated" to DLA Piper's (essentially concluded) arrangement with Stanford and CuraSen.  *Id*.  The next day, Ms. Chen declined to sign a waiver.  *Id*. at 3.

Following this exchange, DLA Piper's Office of General Counsel conducted a thorough review of Stanford's conflict allegations.  Dkt. 95-15 ¶¶ 5–7.  During that investigation, which lasted about two weeks, DLA Piper refrained from performing any work for Ms. Zhang.  Dkt. 95-1 ¶ 17.  Before DLA Piper could finish the investigation, however, it learned on March 31, 2022, that CuraSen had terminated its license agreement with Stanford.  Dkt. 95-15 ¶ 8.  As noted above, *CuraSen's* termination of that relationship also meant the end of DLA Piper's joint representation of the two clients.

Although DLA Piper's representation of CuraSen and Stanford concluded with CuraSen's termination of the license agreement, Mr. Jacobs still refrained from resuming work for Ms. Zhang until Stanford's conflict allegations were fully resolved.  Dkt. 95-1 ¶ 19.  In the meantime, Stanford informed DLA Piper that it had retained new counsel to handle its patent prosecutions, and DLA Piper transferred

Stanford's client files to its new counsel on May 2, 2022. Dkt. 95-6 ¶¶ 43, 45. On

May 6, DLA Piper's Office of General Counsel sent a letter to Stanford's attorneys

in this case explaining that DLA Piper's representation of Stanford had ended and

that there could no longer be any conflict. Dkt. 88-19. Satisfied that any conflict

had been put to rest, Mr. Jacobs finally restarted work on Ms. Zhang's case three

days later. Dkt. 95-1 ¶ 22.

**V.  Despite the conflict's quick resolution, Stanford moves to disqualify DLA Piper from continuing to represent Mr. Jacobs' longtime client, Ms. Zhang.**

After Mr. Jacobs resumed work on Ms. Zhang's behalf, he contacted

Stanford's counsel about a meeting. Dkt. 88-21 at 6. Stanford's counsel refused to

meet with Mr. Jacobs and insisted that the conflict had not been resolved. *Id.*

On May 25, 2022, Stanford filed a motion to disqualify DLA Piper from

representing Ms. Zhang. Dkt. 88. By this time, Mr. Jacobs had served as Ms.

Zhang's counsel in the litigation for two and a half years. Dkt. 26. Stanford's

attorneys argued that DLA Piper had concurrently represented Stanford and Ms.

Zhang solely because Mr. Jacobs had sent them two scheduling emails between

February 15 (the day Mr. Jacobs joined the firm) and March 17 (the day Stanford

alerted DLA Piper of a potential conflict). Dkt. 88 at 10. Stanford also argued

erroneously that *DLA Piper* had terminated its patent work for CuraSen to

11

"convert[] Stanford into a former client" and circumvent the prohibition on concurrent representation.  *Id.* at 15.

In response, DLA Piper emphasized that it was CuraSen's termination of the license agreement that had brought about the end of the representation, not anything DLA Piper did.  Dkt. 95 at 5.  DLA Piper also underscored its efforts in seeking a waiver from Stanford, thoroughly investigating the conflict allegations, and halting work on Ms. Zhang's case until its resolution, all of which demonstrated that it didn't knowingly take on a conflicted representation.  *Id.* at 15.

## VI.   The district court issues an order disqualifying DLA Piper from representing Ms. Zhang based on "automatic disqualification" and "vicarious disqualification" rules.

The district court granted Stanford's motion to disqualify DLA Piper, interpreting California law to require application of two bright-line rules.  *First*, the court applied what it described as a "'mandatory rule of disqualification'" whenever a lawyer represents a client who is "'directly adverse to another client in the same or a separate matter.'"  Dkt. 118 (Ex. A) at 4–5.  Under this rule, based on California Rule of Professional Conduct 1.7(a), *any* adverse concurrent representation of two clients, according to the district court, results in disqualification, regardless of the circumstances.  The court decided that DLA Piper ran afoul of the rule when it briefly represented both Stanford and Ms. Zhang for a month and a half in early 2022, even though DLA Piper did not intentionally take

on a conflicted representation, did no work for Stanford in that period, and did nothing for Ms. Zhang beyond sending two scheduling emails. *Id.* at 6. *Second*, the court applied a "vicarious disqualification" rule, concluding that "[w]hen a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm"— again, without regard to the circumstances of this case. *Id.* at 4.

Applying these rules together, the district court concluded that "DLA Piper must be disqualified." Ex. A at 13. In the court's view, there was no room in the disqualification analysis for any mitigating circumstances. It made no difference, the court reasoned, how long the conflict persisted, whether anyone at DLA Piper knew about it, or even whether the firm performed any work on either case. *Id.* at 8, 12. The court likewise refused to take account of the prejudice disqualification would cause to Ms. Zhang, the lack of prejudice to Stanford, or the possibility that Stanford had brought its motion only for tactical reasons.

## RELIEF SOUGHT

The Court should issue a writ of mandamus directing the district court to vacate its order disqualifying DLA Piper and, on remand, to evaluate whether disqualification is necessary under the totality of the circumstances and in light of the underlying purposes of the disqualification rules.

## STANDARD OF REVIEW

The Court may grant a writ of mandamus if a case satisfies one or more of five factors.  *First*, the petitioner "has no other adequate means, such as a direct appeal, to attain the relief he or she desires." *Douglas v. U.S. Dist. Court*, 495 F.3d 1062, 1065 (9th Cir. 2007). *Second*, "[t]he petitioner will be damaged or prejudiced in a way not correctable on appeal." *Id.  Third*, "[t]he district court's order is clearly erroneous as a matter of law." *Id.* at 1066.  *Fourth*, "[t]he district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules." *Id. Fifth*, "[t]he district court's order raises new and important problems, or issues of law of first impression." *Id.*

In assessing whether mandamus is appropriate, the Court balances each of these factors and need not find that all are satisfied.  *Valenzuela–Gonzalez v. U.S. Dist. Court*, 915 F.2d 1276, 1279 (9th Cir. 1990).  "Exercise of [the Court's] supervisory mandamus authority is particularly appropriate when an important question of law would repeatedly evade review." *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1304 (9th Cir. 1982).

**ARGUMENT**

**I.     The Court should issue a writ of mandamus directing the district court to vacate its order disqualifying DLA Piper.**

This is the rare case worthy of a writ of mandamus.  Ms. Zhang has no other adequate means of relief.  Without this Court's intervention, she'll suffer severe prejudice that can't be corrected even in a post-judgment appeal:  the loss of the experienced and specialized lawyer she hired to defend her, on top of any difficulties and expenses associated with finding a replacement team of lawyers.

To be sure, any litigant on the wrong side of a disqualification order is in much the same position—though the prejudice Ms. Zhang faces is especially acute, given that she's a nonagenarian in poor health on whom this case has imposed a heavy financial burden.  But there are also other reasons to grant review.  For one thing, the district court's order is clearly wrong.  It misinterprets California case law as requiring the application of two bright-line, inflexible disqualification rules that are both incorrect and inconsistent with modern legal practice.  For another, the order raises important and novel issues on which litigants need guidance.  With the proliferation of big, multi-office law firms that span the globe, tactical disqualification motions are increasingly being used to deprive litigants of their right to choose their counsel.  Guidance is necessary to establish the correct

15

standard for disqualification—and writ review is the only way for this Court to provide it.

## A.    A writ is Ms. Zhang's only means to obtain relief.

Orders disqualifying counsel are not immediately appealable. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 440 (1985).  As a result, many courts, including this one, have long recognized that writ relief is an essential "safety valve" permitting courts of appeals to address the erroneous disqualification of counsel. *In re Shared Memory Graphics LLC*, 659 F.3d 1336, 1340 (Fed. Cir. 2011); *accord, e.g.*, *Christensen v. U.S. Dist. Court*, 844 F.2d 694, 697 (9th Cir. 1988); *In re Am. Cable Publ'ns, Inc.*, 768 F.2d 1194, 1195 (10th Cir. 1985).

Although Ms. Zhang "[t]heoretically . . .  could appeal the disqualification of [her] counsel after trial," that appeal wouldn't provide meaningful relief. *Christensen*, 844 F.2d at 697.  A petitioner whose counsel has been disqualified can't "obtain the desired relief on direct appeal because he seeks to be represented by his chosen counsel *at trial*.  Once a new attorney is brought in, the effect of the order is irreversible." *Id.*  By the time of a post-judgment appeal, "the trial would be over, and [Ms. Zhang] would have gone through the litigation without the counsel of [her] choice." *Shared Memory Graphics*, 659 F.3d at 1340; *accord Cohen v. U.S. Dist. Court*, 586 F.3d 703, 710 (9th Cir. 2009) ("a lost choice of counsel cannot

be adequately remedied through means other than mandamus and the resultant harm is not correctable on appeal").

**B.     Ms. Zhang will be severely prejudiced if she cannot obtain writ relief.**

Courts have long warned of the many harms disqualification can cause: "complicated cases . . . take even longer to resolve, the costs of litigation [are] even higher, and unscrupulous attorneys . . .  have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers." *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 809 (2010).  Those harms weigh in favor of granting writ petitions challenging disqualification orders. In *Chambers v. Superior Court*, 121 Cal. App. 3d 893 (1981), for example, the California Court of Appeal granted a writ petition because the case was "already over three years old" and the party who was harmed—"virtually an innocent bystander, and entitled to have counsel of choice"—would have been subjected to "unnecessary further delays." *Id.* at 896–97.

Those considerations weigh even more heavily in favor of review here.  This suit against Ms. Zhang over her late husband's personal papers is nearly four years old, and was brought against her when she was already 90 years old and in frail health.  *See* Dkt. 30 at 11.  Now, through no fault of her own, she finds herself in the unenviable position of having to replace the highly qualified and subject-matter-experienced lawyer she chose years ago to represent her.

17

Disqualifying DLA Piper from representing Ms. Zhang will thus have the "immediate adverse effect" of "separating [her] from counsel of [her] choice." *Chambers*, 121 Cal. App. 3d at 902.  And disqualification is particularly damaging when the client loses the benefit of a lawyer experienced in a "specialized area[] of law"—and where the other side may therefore "find it advantageous to remove him as an opponent." *In re County of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000). That's the case here.

Ms. Zhang chose Mr. Jacobs to be her lawyer because of his work as a former federal prosecutor, because of his familiarity with Stanford (where he went to law school), and because of his experience handling numerous cross-border and politically sensitive cases, including for Chinese clients.  Dkt. 95-1 ¶ 3.  This case requires that expertise because it involves questions of foreign law and the enforceability of foreign legal judgments.  Dkt. 95-1 ¶ 6; *see, e.g.*, Dkt. 30, 46, 67, 73.  The ownership of Mr. Li's papers was already decided by a Chinese court, under Chinese law.  Dkt. 30 at 6.  A central question in this case, then, is whether a U.S. court may second-guess the decision of a Chinese court on a question of  Chinese law.  Ms. Zhang contends it may not—that Stanford had an opportunity to assert its interest in Mr. Li's papers in Chinese court, but declined to do so, and so is now precluded from collaterally attacking what was decided there.  Mr. Jacobs is ideally

suited to address the many complex issues that Stanford's lawsuit implicates—including Chinese, American, and international law bearing on the enforcement of Chinese judgments and the doctrine of claim preclusion.

Mr. Jacobs has also invested significant time in this case and gained experience and insights that will be difficult for any substitute lawyers to replicate, whether at great expense or at all.  He has served as lead counsel for Ms. Zhang since 2019.  Dkt. 95-1 ¶¶ 3–5.  Mr. Jacobs has "created and directed the legal strategy, . . . counseled Ms. Zhang and her attorneys in China, led the discussions with expert witnesses, and . . . taken the lead in factual development."  Dkt. 95-1 ¶ 5.  He developed the counterclaims Ms. Zhang asserted against Stanford and fended off Stanford's motion to dismiss all of them.  Dkt. 100.  And he has led the charge against Stanford on many discovery disputes.  Dkt. 67, 93.  Any new lawyers will have to familiarize themselves with all of these issues, including by digging into the several hundred thousand pages produced in the case, many of which are written in Chinese.  Dkt. 120 at 18 & n.19.

In short, this is not a situation in which the client could reasonably be expected to quickly recover from the disqualification of her lawyer.  Ms. Zhang is old.  She's frail.  This litigation has weighed heavily on her mind.  And disqualification will leave her without the lawyer best equipped to represent her—

and the difficult task of finding replacement lawyers and shouldering the burden of paying for them to learn the case. "'[T]he ability to deny one's opponent the services of capable counsel[] is a potent weapon," *In re County of Los Angeles*, 223 F.3d at 996, and Stanford has used it here to inflict a heavy blow on Ms. Zhang.

**C.** **The district court's reliance on "automatic" and "vicarious" disqualification rules was clearly erroneous.**

In deciding to disqualify DLA Piper from representing Ms. Zhang, the district court misread California case law to impose two bright-line rules that require disqualification in every case involving an adverse concurrent representation, regardless of the circumstances. *First*, the court misread a California Court of Appeal decision as requiring automatic disqualification in *all* cases of adverse concurrent representation. *Second*, the district court also misread a California Supreme Court decision as requiring that an entire law firm *must* be disqualified if one attorney in the firm has a conflict of interest. As the district court saw it, those automatic- and vicarious-disqualification rules together required disqualification here, even if any conflict was inadvertent, short-lived, and harmless.

But the absolutist versions of these rules applied by the district court are inconsistent with California law and modern legal practice. Large firms have thousands of lawyers, who work in offices around the globe, don't all know each other, and certainly don't know what everyone else is doing or thinking.

20

Inadvertently created and quickly resolved conflicts shouldn't automatically and without exception result in disqualification.

**1.** The district court erroneously decided it had to apply a rule of automatic disqualification supposedly laid out in *State Farm Mutual Automobile Insurance Co. v. Federal Insurance Co.*, 72 Cal. App. 4th 1422 (1999), which interpreted the predecessor to California Rule of Professional Conduct 1.7(a).  But *State Farm* doesn't stand for the proposition that disqualification is *automatic* in all cases where an adverse concurrent representation has taken place.  The court in *State Farm* ordered disqualification principally because the firm "*knowingly* undertook adverse concurrent representation." *Id.* at 1432 (emphasis added).  Despite being informed of the conflict on multiple occasions, the disqualified law firm in *State Farm* nevertheless continued to represent both adverse parties and took no action to investigate or cure the conflict.  *Id.* at 1432–33.

Here, by contrast, DLA Piper did not knowingly take on a conflicted representation.  DLA Piper had a good-faith belief that Mr. Jacobs' continued representation of Ms. Zhang after he joined the firm presented no conflicts.  The representation passed multiple conflicts checks because the only client listed in DLA Piper's system for the preexisting patent-related matter was CuraSen.  *See* Dkt. 95-1 ¶¶ 8–12; Dkt. 95-15 ¶ 6.  And after Stanford raised an alleged conflict, the firm

halted all work for Ms. Zhang while it analyzed the issue, which—without any prompting from DLA Piper—was resolved two weeks later when CuraSen terminated its license agreement with Stanford. *Id.* ¶¶ 16–19, 21.

The automatic-disqualification rule applied by the district court is also incompatible with the purpose of the rule against adverse concurrent representations. These rules do not exist in a vacuum. Motions to disqualify should be decided with a view to "the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 453, 457 (D.N.J. 2010) (quoting *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980)).

Many courts, including the California Supreme Court, have explained that the policy underlying the rule against adverse concurrent representation is preservation of the attorney's duty of loyalty. *See, e.g.*, *Flatt v. Superior Court*, 9 Cal. 4th 275, 285 (1994); *Forrest v. Baeza*, 58 Cal. App. 4th 65, 80 (1997). The California Rules of Professional Conduct themselves base the rule regarding adverse concurrent representations on a lawyer's "duty of undivided loyalty." Cal. R. Prof. Conduct 1.7 cmt. 1. But that duty is not implicated here because (1) the conflicting relationship concluded of its own accord, without any action on DLA

Piper's part; (2) DLA Piper had no role in Stanford's prosecution of its case against Ms. Zhang; and (3) DLA Piper did no work on Ms. Zhang's behalf against Stanford until the conflict was resolved. *See generally Chambers*, 121 Cal. App. 3d at 903 (trial court abused discretion by disqualifying law firm where there was no evidence attorney "had any responsibility over matters related to the action herein").  The district court should have exercised its discretion instead of applying a per se disqualification rule that here does nothing to further the policies underlying the rule against adverse concurrent representation.  The court's order serves only to arbitrarily punish Ms. Zhang with the loss of her chosen counsel and reward Stanford, even though it suffered no harm.

**2.**  The district court also erroneously applied, without analysis, a mandatory "vicarious disqualification" rule it derived from *People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135 (1999), which states that "[w]hen a conflict of interest requires an attorney's disqualification from a matter, the disqualification *normally* extends vicariously to the attorney's entire law firm." *Id.* at 1139 (emphasis added).  But the district court took this quotation from *SpeeDee Oil* out of context.  Although it is generally true that lawyers employed at a disqualified attorney's firm are similarly barred from representing the affected client(s), that principle has never been *automatically* applied without

regard to the totality of circumstances.  In other words, per se disqualification is *not* the approach courts have taken with vicarious conflicts.

In fact, this Court has "read *SpeeDee Oil* as sending a signal that the California Supreme Court may well adopt a more flexible approach to vicarious disqualification." *In re County of Los Angeles*, 223 F.3d at 995.  And two recent California Court of Appeal decisions not only reached the same conclusion about *SpeeDee Oil*, but overturned trial court decisions applying the inflexible vicarious-disqualification rule adopted by the district court here. *Cal. Self-Insurers' Sec. Fund v. Superior Court*, 19 Cal. App. 5th 1065 (2018); *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776 (2010).

In *California Self-Insurers*, the Court of Appeal explained that "*SpeeDee Oil* [did not] address[] the issue of whether vicarious disqualification is absolute," and decided that the question whether one attorney's conflict should automatically disqualify an entire law firm is better answered using "a case-by-case analysis based on the circumstances present in, and policy interests implicated by, the case."  19 Cal.App.5th at 1076.  The court in *Kirk* similarly favored a flexible, fact-dependent analysis, explaining that courts should focus on "whether there is a likelihood that other attorneys at the firm may receive and use the information possessed by the tainted attorney in the pending action."  183 Cal. App. 4th at 815.  Because the trial

court in each case applied an inflexible and automatic rule of vicarious disqualification, the Court of Appeal remanded for new decisions on the disqualification motions in light of "all relevant facts and circumstances." *Cal. Self-Insurers*, 19 Cal. App. 5th at 1079; *accord Kirk*, 183 Cal. App. 4th at 816–17.

That disposition in *California Self-Insurers* came notwithstanding the sort of extreme facts that one might think would support automatic disqualification. There, the defendants moved to disqualify the law firm representing the plaintiff after it hired an attorney who represented some of the defendants in the *same case*. The trial court granted the motion, assuming it was compelled by law to disqualify the firm. 19 Cal. App. 5th at 1072. The Court of Appeal nevertheless granted the plaintiff's writ petition, explaining that the trial court needed to "engage in the factual analysis discussed in *Kirk* before exercising its discretion to determine if disqualification is necessary." *Id.* at 1079. Engaging in this factual analysis "protect[s] clients on both sides" and "avoids the harshness of implying an automatic rule that may not be necessary or appropriate." *Id.* at 1077.

Here, just as in *California Self-Insurers* and *Kirk*, the district court should have accounted for the facts to "protect clients on both sides." No one here contends that any attorney was disloyal or passed on confidential information. And for good reason—Mr. Jacobs and Dr. Haile are in different practice groups, working out of

25

different offices on completely different matters.  The small amount of work DLA Piper did jointly for CuraSen and Stanford to prosecute and license patents relating to "the treatment of learning and cognitive disabilities in people with Down syndrome and dementia in Alzheimer's disease," Dkt. 88-2 at 1, has nothing to do with this case over the personal papers of a senior member of the Chinese Communist Party.

**3.**   The district court's inflexible application of both of these bright-line disqualification rules was clear error under California law.  The automatic- and vicarious-disqualification rules work together to deny parties the "important right to counsel of one's choosing."  *Forrest v. Baeza*, 58 Cal. App. 4th 65, 73 (1997).  The district court itself acknowledged as much.  Quoting *SpeeDee Oil*, the court concluded that, despite the importance of the right to choose one's counsel and the burdens of changing counsel, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." Ex. A at 11–12 (quoting *SpeeDee Oil*, 20 Cal. 4th at 1145).  But later precedent commands the opposite result:  "in certain cases, the public trust in the scrupulous administration of justice is *not* advanced (and, in fact, may be *undermined*) by an order disqualifying a party's long-term counsel due to the presence of another attorney in a different office of the same firm, who possesses only a small amount

26

of potentially relevant confidential information, and has been effectively screened." *Kirk*, 183 Cal. App. 4th at 809 (emphasis altered).[1]

As *Kirk* and *California Self-Insurers* make clear, vicarious disqualification of an entire law firm based on one attorney's conflict of interest is not, and should not be, automatic.  The district court's use of these bright-line rules is inconsistent with the more nuanced approach correctly favored in *Kirk* and *California Self-Insurers*. *Kirk* explained that "judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice."  183 Cal. App. 4th at 792. "Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." *Id.*

Applying this standard, the district court's order disqualifying DLA Piper as counsel for Ms. Zhang was clear error.  Disqualifying the entire law firm of DLA Piper—based on some entirely unrelated patent work by Dr. Haile that was performed in another office and essentially concluded at the time the conflict

---

[1]  Here, an ethical "screen[]" was not necessary because Dr. Haile had *no* "potentially relevant confidential information." *See supra* pp. 11, 29.

inadvertently arose—serves only to deprive Ms. Zhang of her long-time counsel and burden her with the obligation of trying to find a similarly qualified lawyer as Mr. Jacobs—to the extent that is possible.  As in *Chambers*, "disqualification at this late date would have an immediate adverse effect on the innocent client, and unnecessarily delay the judicial process."  121 Cal. App. 3d at 903.

Further, there was no violation of client confidentiality, no work was performed for Ms. Zhang or Stanford while DLA Piper investigated the conflict, and the conflict was resolved because of CuraSen's termination of the license agreement (not anything DLA did).   Dkt. 95-1 ¶¶ 8–12, 16–19, 21.   Indeed, Stanford's only conceivable purpose in moving to disqualify DLA Piper was to deprive a 93-year-old widow of her chosen counsel after years of litigation had already passed.  The district court should have "protect[ed the] clients on both sides" and at least considered those facts, among others, before deciding Stanford's motion. *Cal. Self-Insurers*, 19 Cal. App. 5th at 1077.

**D.     The district court's order raises a novel and important issue that would repeatedly evade review absent mandamus.**

A per se disqualification rule that applies to an *entire law firm*, no matter how long the conflict has existed, and even if it was inadvertent, has been cured, and caused no harm, depends on "an outdated view of the practice of law." *Kirk*, 183 Cal. App. 4th at 801.   The automatic- and vicarious-disqualification rules

applied by the district court together make for an outrageously punitive legal standard that is inconsistent with modern legal practice. California courts have correctly recognized that "a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. . . . [J]udges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice." *Cal. Self-Insurers*, 19 Cal. App. 5th at 1071. As law firms continue to grow, the application of bright-line disqualification rules raises novel and important issues that necessitate re-examination and clarification of the law. And those issues warrant mandamus review because they are unreviewable after final judgment and so would "repeatedly evade review." *In re Cement*, 688 F.2d at 1304.

The vicarious-disqualification rule is based on the premise that attorneys in the same law firm work together. *Kirk*, 183 Cal. App. 4th at 802. But, as the court in *Kirk* recognized, "[i]n a situation where the everyday reality is no longer that all attorneys in the same law firm actually work together, there would seem to be no place for a rule of law based on the premise that they do." *Id.* (cleaned up). Noting "the changing landscape of legal practice," the court questioned why courts should worry about a "tainted attorney working in a different geographical office and in a different practice group from the attorneys with responsibility for the litigation.

29

These are not attorneys discussing their cases regularly, passing each other in the hallways, or at risk of accidentally sharing confidences at lunch." *Id.*

This is particularly true following the COVID-19 pandemic. Despite the lifting of COVID protocols, many lawyers are still choosing to work remotely, making their in-person interactions with their colleagues—even within the same office—few and far between. Amanda Roberts, *Working Remotely Is Now a Top Priority, Says New ABA Report Highlighting Lasting Shifts in Practice of Law*, ABA Journal (Sept. 28, 2022), https://tinyurl.com/3kkkk3k4.

As law firms continue to grow in terms of both size and geography, legal scholars likewise have begun to challenge per se disqualification rules. One article notes that "[t]he wisdom behind the *per se* rule is questionable given the current legal landscape. There are international and national law firms with many lawyers and offices, such that there is no genuine risk that a lawyer in Los Angeles would be influenced by, or even have knowledge of, actions of a lawyer in New York on an unrelated case." Mark T. Drooks & Jessica S. Chen, *Judicial Discretion Advised: A Critique of California's* Per Se *Disqualification Rule in Concurrent Representation Cases*, 26 CAL. LITIG. 25, 27 (2013). And large law firms are only getting larger. *See* Cassandra B. Robertson, *Conflicts of Interest and Law-Firm Structure*, 9 ST. MARY'S J.

ON LEGAL MALPRACTICE & ETHICS 64, 72 (2018) ("Over the last decades, mega-firms have grown exceedingly quickly in the legal profession.").

Legal scholars have increasingly urged courts to re-visit disqualification rules in light of the growth of big law firms.  As one article recognized, "[i]n the mega-firm context, imputing a single lawyer's conflict to the entire global entity has the effect of conflicting out a very large number of attorneys.  And, it is not at all clear that there are truly gains in the protection of loyalty or confidentiality to make such a limitation worth it."  Robertson, *supra*, at 83.  Yet disqualifications do bring clear *dis*advantages:  "[w]hen an improperly imputed conflict leads to an unnecessary disqualification, individual harm accrues to the opposing client that has now lost its choice of counsel.  The client whose lawyer has been disqualified must spend time, money, and effort to seek new counsel, and the case will likely face delay."  *Id.* at 84.

Disqualifications based on technical conflicts unlikely to have resulted in any breach of the duties of confidentiality and loyalty have become only likelier with the acceleration of firm mergers and lateral hiring.  The number of law-firm mergers completed in the first quarter of 2023 surpassed the number of *all* such mergers completed in 2022.  Sara Merken, *Big Law Firms Quicker to Merge in 2023 So Far, Report Shows*, Reuters (Apr. 4, 2023), https://tinyurl.com/2p8zu5cp.  And

lateral hiring has also jumped in the past decade, with Am Law 200 firms hiring about 1,765 more lateral associates than entry-level associates in 2022.  Andrew Maloney, *Big Law Continues to Favor Transfers Over Entry-Level Associates*, ALM (Mar. 13, 2023), https://tinyurl.com/2p8jnz7v.   Disqualifying law firms automatically whenever any conflict arises, "even when no substantial relationship exists between matters and no fundamental client interest seems to be threatened," does nothing more than "take up the time of courts and litigants." James B. Kobak, Jr., *Dealing with Conflicts and Disqualification Risks Professionally*, 44 HOFSTRA L. REV. 497, 499–500 (2015).

In light of the rapid changes in the legal industry and their impact on clients' right to choose their counsel, courts across the country have begun to disfavor inflexible application of bright-line disqualification rules.  In *Wyeth v. Abbott Laboratories*, 692 F. Supp. 2d 453 (D.N.J. 2010), for example, a law firm represented both the defendants in patent-infringement cases in the United States and the plaintiff in those same cases in other, unrelated patent-infringement cases in Europe.  692 F. Supp. 2d at 454.  Despite this adverse concurrent representation, the court overturned the magistrate judge's order disqualifying the law firm based on a per se disqualification rule, explaining that the "more modern approach" was for courts to "carefully examine the totality of the circumstances, taking a balanced

32

approach that includes evaluating the impact, nature and degree of a conflict." *Id.*

at 457.  The court was "hard-pressed to see how [the duty of loyalty would] be

compromised under the facts of this case," where the matters at issue were

completely unrelated, there were no overlapping personnel, the moving party was

unable to identify any confidential information that could have been shared, the

European matter had been dormant since before the conflict arose, and the moving

party did not identify any prejudice it would suffer if the firm was not disqualified.

*Id.* at 459–61; *see also, e.g.*, *Reilly v. Comp. Assocs. Long-Term Disability Plan*, 432

F. Supp. 2d 5, 7–9 (E.D.N.Y. 2006) (taking similarly flexible approach).

Although some courts have modernized the standard applied to

disqualification motions, the law in California remains unsettled, given that the

California Supreme Court has yet to decide whether disqualification is required in

a case like this one.  *Cal. Self-Insurers*, 19 Cal. App. 5th at 1077 ("[W]hether

disqualification of the entire firm is automatic is an open question.").  Whether

these bright-line rules apply to disqualify an entire law firm even after a conflict has

been cured is a deeply important issue because such rules are ripe for tactical abuse

and highly prejudicial to litigants' fundamental right to choose their own counsel.

*In re County of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000) ("The vicarious

disqualification of an entire firm . . . raises the specter of abuse: A motion to

disqualify a law firm can be a powerful litigation tactic to deny an opposing party's counsel of choice.").  The better, "more modern approach is for courts, when faced with a conflict problem, to carefully examine the totality of the circumstances." *Wyeth*, 692 F. Supp. 2d at 457.

"[W]ith the proliferation of multi-office 'mega-firms,' frequent firm mergers, and attorneys increasingly changing firms throughout their careers, clients are at greater risk of finding their long-standing attorney-client relationships challenged due solely to their counsel's changing affiliations."  *Kirk*, 183 Cal. App. 4th at 809. That is precisely what happened here.  And there isn't enough law making clear to district courts that they should resolve motions like Stanford's under a holistic, fact-specific framework rather than under the rigid, hyper-technical, and unjust approach the district court applied below.  The Court should grant this petition to clarify this important issue, particularly because there is no realistic possibility it could do so in any post-judgment appeal.

## II.   In the alternative, the Court should certify the issue presented to the California Supreme Court and stay the case.

This Court has broad discretion to certify questions to state supreme courts. In determining whether to do so, the Court considers: "(1) whether the question presents 'important public policy ramifications' yet unresolved by the state court; (2) whether the issue is new, substantial, and of broad application; (3) the state

court's caseload; and (4) 'the spirit of comity and federalism.'"  *Murray v. BEJ Minerals, LLC*, 924 F.3d 1070, 1072 (9th Cir. 2019) (en banc).

This case presents an important question that has never been resolved by the California Supreme Court.  As the Court of Appeal noted in *Kirk*, "[t]he Supreme Court recognizes that whether vicarious disqualification is always absolute is still an open question."  183 Cal. App. 4th at 797 (initial caps omitted).  It has "never directly addressed the issue on the merits."  *Id.* at 800; *see also id.* at 805 ("[T]he issue of whether attorney screening can overcome vicarious disqualification in the context of an attorney moving between private law firms is not clearly settled in California law.").

The *Kirk* court recognized that "changing realities are undermining the rationale for an automatic rule of vicarious disqualification."  183 Cal. App. 4th at 801 (initial caps omitted).  And the application of that rule has significant consequences.  In this case, it resulted in the disqualification of a litigant's longtime attorney over a technical and ephemeral conflict that caused no harm whatsoever.  That result is inconsistent with the judiciary's interest in preserving the continuity of the lawyer-client relationship.  *See id*. at 809.  Failing to safeguard this relationship has severe consequences: "complicated cases . . . take even longer to resolve, the costs of litigation [are] even higher, and unscrupulous attorneys

35

. . . have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers." *Id*.

In other words, overzealous application of disqualification rules—in the name of "client protection," even where it's unnecessary—can actually pose a new set of risks to clients.  Courts must protect not just client confidences, but *also* the "client who has established a longstanding relationship with counsel, and is at risk of losing that attorney by means of vicarious disqualification" through no fault of her own.  *Kirk*, 183 Cal. App. 4th at 809.

Moreover, other state supreme courts have cautioned against application of automatic-disqualification rules, in large part due to concerns over tactical abuse and judicial economy.  In *Solow v. W.R. Grace & Co.*, for example, the New York Court of Appeals warned that the "rigor" of per se disqualification rules means that disqualification motions are "frequently used as an offensive tactic, inflicting hardship on the current client and delay upon the courts by forcing disqualification even though the client's attorney is ignorant of any confidences of the prior client." 83 N.Y.2d 303, 310 (1994).  And even if frivolous motions are eventually denied, they still result in a tremendous waste of resources.  *See id*.

The continuing uncertainty over whether California law really demands automatic disqualification in cases like this one, without any regard for mitigating

circumstances, and the significant policy implications for California's practitioners and litigants alike make the issue appropriate for certification to the state's highest court.

## CONCLUSION

When deciding disqualification motions, courts should be able to consider all the facts, including whether the conflict was knowingly created, how long it lasted, whether the moving party has actually suffered any harm, and whether the nonmoving party stands to suffer severe and incurable harm.  This case—which turns on a fleeting and inadvertently created conflict that didn't harm Stanford but does threaten to severely harm an elderly widow—demonstrates the importance of such context, which the district court erroneously refused to consider.  This Court should issue a writ of mandamus directing the district court to vacate its order disqualifying DLA Piper and to apply a standard accounting for the totality of the circumstances.

Dated: May 9, 2023         Respectfully submitted,

*/s/ Charles L. Deem*
Charles L. Deem

*Attorneys for Yuzhen Zhang*

**CERTIFICATE OF COMPLIANCE**

This petition complies with Federal Rules of Appellate Procedure 21(d)(1)

and 32(g) and Circuit Rules 21-2(c) and 32-3(2) because it contains 8,480 max

words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

The petition's type size and typeface comply with Federal Rule of Appellate

Procedure 32(a)(5) and (6) because the petition has been presented in 14-point

New Century Schoolbook type.

Dated:  May 9, 2023                                    */s/ Charles L. Deem*
                                                       Charles L. Deem

**CERTIFICATE OF SERVICE**

I certify that on May 9, 2023, I electronically filed the foregoing petition with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I further certify that on the same day, I caused the petition to be served by email and by commercial carrier for next-day delivery upon the following:

Mark D. Litvack
Jeffrey D. Wexler
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 S. Figueroa St., 36th Floor
Los Angeles, CA 90017-5524
mark.litvack@pillsburylaw.com
jeffrey.wexler@pillsburylaw.com

*Counsel for Plaintiff-Respondent*

Dated: May 9, 2023                    DLA PIPER LLP (US)

By:   */s/ Charles L. Deem*
            Charles L. Deem