UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>        Plaintiff<br><br>v.<br><br>ZHANG YUZHEN, an individual; FAN MIAO, an individual; and FAN MAO, an individual. | Case No. 19-cv-02904-JST<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| ZHANG YUZHEN, an individual,<br><br>        Counterclaimant,<br><br>        v.<br><br>LI NANYANG, an individual; THE BOARD OF TRUSTEES OF LELAND STANFORD JUNIOR UNIVERSITY,<br><br>        Counterclaim Defendants. | |

United States District Court
Northern District of California

This matter came before the Court for trial on August 19, 20, 21, 27, 28, and 29, 2024; and December 10, 2024. Having considered the evidence presented at trial, as well as the arguments of counsel, and good cause appearing, the Court now rules as follows:

I.    BACKGROUND

This is a quiet title action. Plaintiff Board of Trustees of Leland Stanford Junior University seeks to quiet title in certain materials denominated the Li Materials, which consist of original materials written by Chinese political figure Li Rui (the "Li Manuscripts"); materials

written by people other than Li Rui, including his first wife, Fan Yuanzhen; copies of these materials; and transcriptions of these materials (primarily of Li Rui's diaries).  Stanford and Li's daughter, Li Nanyang, contend that: (1) during his lifetime, Li Rui gave the Li Materials to Li Nanyang and instructed her to make a permanent gift of the Li Materials to Stanford, to be preserved by and made freely available for scholarly research and public review at the Hoover Institution Library & Archives at Stanford University ("Hoover"); and (2) in accordance with Li Rui's instructions, the original Li Materials were donated to and delivered to Hoover by Li Nanyang prior to Li Rui's death.

Defendant and Counterclaimant Zhang Yuzhen, who was Li Rui's second wife, contends that Li Rui did not transfer ownership of his original manuscripts to Li Nanyang, and that Li Nanyang did not have the legal right to donate any of Li Rui's original materials to Hoover prior to Li Rui's death.  Zhang Yuzhen further contends that pursuant to the Chinese court's judgment in a proceeding called the Zhang Action, she is the sole owner of the original manuscripts contained in the Li Materials, and that this Court should recognize and enforce the Chinese judgment and order Stanford to return to Zhang Yuzhen the original manuscripts that were improperly transferred to Stanford by Li Nanyang.  She counterclaims for conversion, aiding and abetting conversion, civil conspiracy to commit conversion, and enforcement of the Zhang Judgment (described more fully below).  Only the disposition of the Li Manuscripts is at issue in the claims and counterclaims between Zhang Yuzhen and Stanford and Li Nanyang.[1]  Stanford responds that the judgment in the Zhang Action is not entitled to recognition in this court because, among other reasons, the Chinese court lacked jurisdiction over Stanford; Stanford was denied the opportunity to appear and present evidence in the Zhang Action, notwithstanding its significant efforts to do so; and the proceedings bore several indicia of control and influence by the Chinese Communist Party ("CCP") showing that the proceedings were unfair.

---

[1] On August 25, 2025, following Zhang Yuzhen's death, the National Library of China was substituted in as a party to this action in her place pursuant to Federal Rule of Civil Procedure 25(a)(1).  ECF No. 193.  For continuity, this order refers to Zhang Yuzhen as the party in interest because of her personal involvement in the facts.

## II.    FINDINGS OF FACT

The facts underlying this action are largely undisputed.

### A.    The Parties

Plaintiff and Counterclaim Defendant The Board of Trustees of The Leland Stanford Junior University ("Stanford") is a research and teaching institution with its principal place of business in Stanford, California.  The Hoover Institution ("Hoover") is part of Stanford and does not have a separate legal existence.

Counterclaim Defendant Li Nanyang is a resident of California and is Li Rui's older daughter.  Li Nanyang is married to Ba Tizhong.

Defendant and Counterclaimant Plaintiff Zhang Yuzhen was a resident of the People's Republic of China (the "PRC" or "China") and the widow of Li Rui.  She died sometime between the conclusion of the evidence in this proceeding and June 11, 2025.

Defendant Fan Miao is a resident of the PRC and is Li Rui's only son.

Defendant Fan Mao is a resident of the PRC and is Li Rui's younger daughter.

### B.    The Hoover Institution

Hoover is a public policy research center devoted to the advanced study of politics, economics, political economy—both domestic and foreign—and international affairs.  The mission statement of Hoover states in part: "The overall mission of this Institution is, from its records, to recall the voice of experience against the making of war, and by the study of these records and their publication, to recall man's endeavors to make and preserve peace."

The Library & Archives at Hoover contains documentation on modern history and is a core component of Hoover.  Founded in 1919, the Hoover Institution Library & Archives is dedicated to documenting war, revolution, and peace in the twentieth and twenty-first centuries, and it contains nearly one million volumes and more than six thousand archival collections from 171 countries.  Part of the Library & Archives is the East Asia Collection, which includes private papers donated or deposited by former national leaders, public servants, military personnel, and others from China, Hong Kong, Taiwan, Japan, Korea, and other parts of East Asia.

United States District Court
Northern District of California

Included in the East Asia Collection is the China Collection. Hoover holds a large collection of materials relating to the CCP, documenting political, economic, and social developments during the revolution of 1911, the warlord period, the civil war, and the post-1949 period. The China Collection also includes hundreds of rare pre-1949 Chinese publications. Due to the variety and significance of the China Collection, the Library & Archives has become an influential hub for modern and contemporary Chinese studies.

### C.    Li Rui and the Li Materials

Li Rui was born on April 13, 1917. He was a significant Chinese political figure. He joined the CCP in 1937. He began to keep a diary in 1938, although because the country was at war, his early diaries are now lost. He began keeping a permanent diary in 1946, and his last diary entry was March 27, 2018. With rare exception, he made diary entries every day. All told, his diaries comprise 47 books totaling many thousands of pages.

In addition to his diaries, Li Rui also kept letters, photographs, and other materials from 1938 to 2018, including, but not limited to, personal diaries created from at least 1938 to 1944 by Li Rui's first wife, Fan Yuanzhen; a diary from at least 1951 to 1952 created by both Li Rui and Fan Yuanzhen; and correspondence between Li Rui and Fan Yuanzhen, written from at least 1939 to 1960.

The Li Materials are currently housed at the Hoover Library & Archives and include letters, meeting minutes, work notes, diaries, and poetry written by Li Rui. The Li Materials also include letters and other documents written by individuals other than Li Rui, and video and audio recordings of Li Rui and others.[2]

---

[2] The only Li Materials that are at issue between Stanford and Zhang Yuzhen are those materials that were originally written by hand by Li Rui, which are the following materials identified on Exhibit A to Stanford's First Amended Complaint, ECF No. 15: Boxes 1-6; Box 11, folders 8-11 (not including "donor's notes"); Box 12; Box 13, folders 1-3 (letters from Li Rui only); Box 13, folders 4 & 5; Box 14, folders 1-3, 4.2-4.6 & 11; Boxes 15-24 (the Li Manuscripts).

The remaining Li Materials – which are comprised of all materials identified on Exhibit 319 other than those identified in the prior paragraph (*i.e.*, Boxes 7-10; Box 11, folders 1-7, Box 13, 1-3; Box 14, folders 4.1, 4.7-4.10, 5-10; Boxes 25-36) – are at issue in Stanford's Quiet Title claim against the world (including Fan Mao and Fan Miao). Zhang Yuzhen has not claimed ownership over these Li Materials, and no party appeared at trial to dispute Stanford's claim to title.

United States District Court
Northern District of California

In December 1939, Li Rui married his first wife Fan Yuanzhen. He had three children with Fan Yuanzhen, including a son, Fan Maio, and two daughters, Fan Mao and Li Nanyang, all of whom are parties to this proceeding. Li Nanyang, a counterclaim defendant in this case, was born in 1950. Li Rui and Fan Yuanzhen divorced in 1944; remarried in 1945; and divorced again in 1961, while Li Rui was in prison.

Li Rui held various government positions in the People's Republic of China during the 1950s. He became Chairman Mao's personal secretary in 1958, placing him at the center of political activity in China.

Li Rui was a person of strong opinions who spoke out against the CCP during his lifetime and who "ha[d] a lot of guts." R.T. 78:22–23 (Aug. 19, 2024). In 1959, Li Rui attended a leadership meeting of the CCP called the Lushan Conference. At the conference, Li made comments critical of Mao Zedong and the CCP. Because of these criticisms, Li Rui was exiled and transferred between jail and work camps for approximately 20 years.

First, he was sent to a hard labor camp. Following that, he was sent to a small hydropower station in a village called Mozitan where he provided education to the workers.

When the Cultural Revolution began in 1966, Li was placed back into custody and sent to Qincheng Jail to perform hard labor. His first wife divorced him at that time because he had been designated an enemy of the people.

While he was at Qincheng Jail, Li began writing poetry. He used gentian violet—an antiseptic dye—to write poetry in the margins of books he was reading. Later, after his release, the poems were collected and published in a book called Gentian Violet Poems.

In 1975, Li was released from Qicheng Jail and again sent to labor at Mozitan.

In 1979, two-and-a-half years after Chairman Mao's death, Li was released from prison, his membership in the Communist Party was restored, and he was reinstated to his prior position as Deputy Minister of the Electric Power Ministry. Also in 1979, Li Rui married Zhang Yuzhen, and they remained married until Li Rui's death on February 16, 2019.

In 1982, Li became the Deputy Director of the Organization Department of the CCP. During this time, Li also became a member of the Central Committee of the CCP, and then the

United States District Court
Northern District of California

Advisory Committee.

In February 1989, Li Rui visited the Hoover Institution at Stanford University. He was "amazed" by the collection at Hoover because it contained writings about historical events that were not available in China, including extensive materials about the Cultural Revolution.

Li Rui witnessed the events in Tiananmen Square in June 1989 from the balcony of his apartment. He wrote an open letter critical of the CCP's decision to send in soldiers to crack down on the protesting students. He also took notes of the event in his diary.

On August 28, 1999, Li Rui executed a "Testament" noting how fortunate he was to marry Zhang Yuzhen and giving the following "instruction" to his children:

> 1. The copyrights to all my written works (including those already published and those not yet published) shall all belong to Yuzhen after my demise.
>
> 2. All my deposits and household items shall belong to Yuzhen after my demise.
>
> 3. My collection of calligraphy and painting works shall all be managed and handled by Yuzhen after my demise.
>
> 4. All books shall be donated to Pingjiang Library on my behalf by Yuzhen after my demise.

Tr. Exh. 13A. The testament did not address the disposition of the Li Materials.

### D.    Li Nanyang's Efforts to Organize and Translate the Li Materials

Li Nanyang and her family lived with her father from 1979 to 1981. After they moved out, Li Nanyang regularly visited her father, approximately three times a month.

At Li Rui's encouragement, Li Nanyang left China in October 1990, moving first to West Germany, then to Switzerland, and finally to the United States. After leaving China, starting in 1994, Li Nanyang regularly returned to China three or four times per year for work and to visit Li Rui, and she would stay in China for between two weeks and a month-and-a-half.

Li Nanyang began writing about her life and her family in 1997. She published several books related to Li Rui and her family, including "I Have Such A Mother," "Old Letters of My Parents," "A Lonely Goose, Waiting for Spring to Come Back," three volumes of the Li Rui Diaries, an oral history of Li Rui, "My Father, Li Rui," and "A Life Overseas." Li Rui gave his

daughter all of the letters written between him and Li Nanyang's mother so she could write a book about them. Li Nanyang delivered copies of all of these books to her father.

In 2004, Li Rui gave Li Nanyang some additional letters from the period 1975 to 1979 because he wanted to publish them into a book. Li Nanyang prepared a book using the letters and sent it to a Chinese publishing house, which forwarded the materials to the Chinese Propaganda Department, which determined that the book could not be published. She then caused the book to be published by a publisher in Texas. Before the book was published, Li Rui proofread the manuscript and provided comments.

On July 12, 2004, Li Rui wrote a letter in which he stated, "I entrusted my eldest daughter, Li Nanyang, with the organization and preservation of my letters with my ex-wife, Fan Yuanzhen, as well as some scattered diaries from the period before liberation. After my passing they will fully belong to her for her disposal. I hereby wrote this statement as proof." Tr. Exh. 77. The July 2004 letter also included a list detailing the letters and diaries that were subject to that letter.

Li Nanyang needed this letter to show the Chinese publishing house that she had the authority to publish her father and mother's letters. "Old Letters of My Parents" was originally published as a run of 1,000 copies in 2004 and another 1,000 copies in 2005. In 2008, the Chinese publishing house deleted all the letters after the Chinese liberation, and deleted all of Li Nanyang's comments, from the book. These materials were deleted because they were critical of the CCP.

In 2004, Li Rui gave Li Nanyang the originals of letters that he had sent to and from his family when he was exiled at Dabie Mountain from 1975 to 1979. In 2005, at Li Rui's direction, Li Nanyang published a book containing these family letters titled *A Lonely Wild Goose – Li Rui Family Letter Collection 1975-1979*, based on transcriptions that she had prepared of such letters. Li Nanyang gave those transcriptions to Li Rui, and he proofread them and provided comments. The book was to be published in mainland China, but it did not pass censorship of the Propaganda Department, so Li Nanyang published it in the United States. Li Nanyang gave Li Rui copies of the book, and he gave copies of the book to his friends.

In December 2004, Li Rui gave Li Nanyang the original copy of the Gentian Violet Poems. On December 28, 2004, Li Rui wrote in his diary that Li Nanyang was taking the Gentian Violet

Poems to the United States for scanning, that she was working on his materials, and that she planned to come back each year to continue that work:

> In the morning, Xi Qing, Xiaomei,[3] and Tizhong worked together to organize my old materials and letters. . . . Xi Qing stayed behind to talk with Yuzhen about the significance of organizing old miscellaneous documents. There is nothing more I can do. Xiaomei plans to come back each year to deal with this matter. Yuzhen said that the original documents should remain in China (scanning the original "Gentian Violet poems" will take a lot of effort and time. She is bringing them back to the US this time, and will bring them back next time.)

Tr. Exh. 82 (Li Rui's December 28, 2004 diary entry).

Starting in 2004, the National Library of China made scans of Li Rui's diaries for 1946 through 2003, and Ms. Li received copies of those scans with Li Rui's knowledge and consent. She began transcribing her father's diaries in 2005. Li Rui was aware of his daughter's work on the diaries because she told him about it and because he assisted her interpreting handwritten characters in his diaries that she was unable to read. He consented to the scanning of his diaries for this project. Li Nanyang has read all of Li Rui's diaries on multiple occasions. Over the course of more than a decade, she transcribed all of Li Rui's diaries and many of the other Li Materials, and she also made scans of many of his diaries and the other Li Materials. Li Nanyang compiled her father's materials, including compiling his diaries between 1946 and 1980 into three volumes of books. Li Nanyang prepared transcriptions of the Li Materials with Li Rui's knowledge and consent. At his direction she made scans of the Li Materials with his knowledge and consent.

On March 26, 2005, Li Nanyang wrote a letter to Li Rui, telling him:

> As for your estate, I think that out of every member of the family, I am the only one who has the ability to inherit your spiritual legacy. For the rest of my life, Tizhong and I will work together to sort through your letters, diary, the Gentian Violet poetry collection, and other correspondence, and open them to the public.

Tr. Exh. 83 (Li Nanyang March 26, 2005 letter to Li Rui).

On October 15, 2006, Li Rui wrote a letter to Li Nanyang and Ba Tizhong, in which he

---

[3] Li Rui sometimes referred to Li Nanyang as "Xiaomei."

United States District Court
Northern District of California

said:

> Last time, we talked on the phone and said that Tizhong must bring the two original copes of the Gentian Violet Books back this time, because several museums and libraries in China want to collect the book. The day before yesterday, Jiaman from upstairs gave me your email and asked me to correct a few words. For those diary books of Mozitan period and also before, which you took, you must bring all of them back and I want them in my keeping. I will think about what to do with them. (Back at that time, I didn't know what were cleared out of my office. Were there any more letters?) I plan to start to sort through these miscellaneous documents and items next year. I haven't finished reading the proofread diaries. Should the diaries be published or not, most people do not support to publish them right now, but I'll make final consideration.

Tr. Exh. 84 (October 15, 2005 letter from Li Rui to Li and Ba Tizhong).

In October 2006, Li Rui asked that Li Nanyang have her husband, Tizhong, return the Gentian Violet poems to him. Li Nanyang did not give the poems to Tizhong after all, however, because she learned that the apartment of Ding Dong, who was assisting Li Rui with the publication of his oral history, had been searched by the Chinese authorities; the books and computer in his apartment were taken; and he was detained. Also, Li Nanyang had been searched by Customs officials previously and she worried that if she had possession of the Violent Gentian poems when she crossed the border they would be confiscated and lost forever.

On October 26, 2006, Li Nanyang wrote a letter in response to Li Rui stating:

> I didn't give the Gentian Violet Books (Long Dan Zi) to Tizhong to bring them back for three reasons: 1. We haven't finished copying the Gentian Violet Books. Before officially donating them, our family should keep a duplicate as the memorial for family descendants. 2. It is not safe to bring the books back right now. . . . 3. Both I and Tizhong agree with you on donating the Gentian Violet Books to the country and we will support your decision one hundred percent. However, the current situation in Mainland China has no legal guarantee to protect such "political cultural heritage" from being destroyed. . . . Without a system guarantee, but only a promise of a person or a unit, should priceless relic witnessing history from you, a top dissent be handed to any organization in Mainland China, it cannot be reassuring.

Tr. Exh. 85 (October 26, 2006 letter from Li Nanyang to Li Rui).

On October 27, 2006, Li Nanyang wrote another letter to Li Rui, in which she stated:

> Diaries: I asked Xiaoman from upstairs to forward you an email, telling you that the entire collection of the originals of your diaries is

9

kept at the Rare Books Division of the National Library. I did not take any of them. At present, I'm using the disks of scanned copies provided by the Rare Books Division to organize your diaries before 1979. . . .

My principle and bottom line: I have not taken and will not take away any of your textual materials that you did not agree to give to me. I have never and will never consider whether the textural materials can be organized and published and where they will end up. By doing so, I won't feel self-blamed and heavy-burdened. I will do the best I can to work on every material you give me, and every effort must yield results. Old Day Letters of My Parents (Fumu Zaonian Shuxin), LI Rui's Photo Albums (two volumes and the disk), and LI Rui Family's Letters, you've seen all these results. You have never told me whether you are satisfied with these things I did. However, I feel content enough that you have never criticized me. What I am doing now is organizing your diaries before 1979. At present, no publishers show interest in this part of the diaries, but they have great historical value. In addition, there is no sensitive information related to internal affairs of the leadership. So these diaries can be published while you are alive. I will try to work with Tizhong and finish this work, so that you can see the results.

Tr. Exh. 86 (October 27, 2006 letter from Li Nanyang to Li Rui).

In a recorded conversation with Li Nanyang in October 2007, Li Rui stated his intent to work on his diaries with Li Nanyang:

Li Nanyang: We shouldn't wait forever.

Li Rui: What?

Li Nanyang: We shouldn't wait forever.

Li Rui: We won't. Those materials at hand. I will stop after writing the letter for the 17th National Congress of the CCP. I will be working on my own material. I will work on my diary and then those letters.

Li Nanyang: Good, that will be great. So, just like what we did before: I type them in.

Li Rui: What?

Li Nanyang: I will type your letters. And then print out as a book for you. You can make selections. You can choose which part needs to be done first.

Li Rui: It would be easy if you come back once or twice every year.

Li Nanyang: So, after I compile them. When I'm away, you may proofread them, right?

Tr. Exh. 91 (transcription and translation of October 2007 audio recording).

In April 2007, Li Rui asked for and received his original diaries back from the National Library. Li Rui sought the return of his original diaries from the National Library due to the retirement of Ba Tizhong's close friend, who was responsible for maintaining and scanning the diaries at the National Library. Li Rui did not trust the National Library to preserve the original diaries in the absence of Ba's friend.

In another recorded conversation between Li Rui and Li Nanyang in October 2007, Li Rui and Li Nanyang discussed the work that the two of them had done and were continuing to do on his diaries:

> Li Rui: About my diary I have modified and finished them for a few years. And the one you compiled I have skimmed over it. The annotations. There is no way for you annotating some of them. You didn't understand and can't add annotations. For example, in Chengde there are some people the "Huang" in Zhang Lingbin's place.
>
> Li Nanyang: Yes, I don't know who that is.
>
> Li Rui: That's Huang Yongsheng. I met Huang Yongsheng, and Qiu Huizuo in Chengde.
>
> Li Nanyang: Oh.
>
> Li Rui: And the diary, What I'm working on all are after 1982.
>
> Li Nanyang: Yes.
>
> Li Nanyang: So, I think no one is compiling those written before.
>
> Li Rui: I need you to continue working on those written before and finish them.
>
> Li Nanyang: Alright, I have already finished them up to 1979.
>
> Li Rui: All finished?
>
> Li Nanyang: What I mean is that I have typed and printed them. All printed out. But they are not typeset into books. That's this period. And about that period I am working on making them into books. Next time I will make those written before 1979 into books. . . .

Tr. Exh. 92 (transcription and translation of October 2007 audio recording).

In 2008, Li Nanyang published *Li Rui Diary*, a three-volume collection of Li Rui's diaries covering the period from 1946 through 1979. The books were published in the United States because no publishing company in China would agree to publish them, as Li Rui had been put on a

11

blacklist by the CCP, meaning his materials could not be published in mainland China. Li Nanyang gave Li Rui copies of *Li Rui Diary*, and he gave copies of the books to his friends and visitors.

In 2009, Li Nanyang asked Li Rui and his friend and collaborator, Ding Dong, if she could work with them on an "Oral History Project" that they had commenced in 2002; Ding Dong had recorded interviews of Li Rui to be turned into a book telling Li Rui's story, but they had never completed the book. Li Rui agreed that Li Nanyang could continue the work. She prepared transcriptions of the interview recordings, which she sent to Li Rui so that he could proofread them and provide corrections.

In 2010, consistent with Li Rui's desire to archive copies of his materials outside of China, Li Nanyang started to make scans of her father's diaries each time she returned to China to visit him. On May 23, 2010, Li Rui wrote in his diary, "In the morning, Xiaomei came and prepared to stay for three days. Planned to make copies of the Diaries from the past few years. She brought back a scanner and it will take a few hours to complete the scanning of one diary note book." Tr. Exh. 94.

On May 25, 2010, Li Rui and Li Nanyang discussed her work—that she would make transcriptions of the diaries without any changes or edits, that he would help her do this, and that they would find a way to preserve his diaries. That day, Li Rui wrote in his diary, "Xiaomei came over early in the morning, had lunch, and did not leave until four o'clock. She is going back to the US tomorrow. I discussed with her about issues of handling my diary, books, and other items after my death." Tr. Exh. 96.

In a conversation between Li Rui and Zhang Yuzhen on October 11, 2010, Zhang Yuzhen said, "I have no problem with publishing [Li Rui's] diary. But about some content, many people, comrades think they should be deleted, shouldn't be kept. I also think they shouldn't be kept." Tr. Exh. 100. "But," she said, "your father's thought is different from mine." *Id.* She continued, "About publishing this diary, everybody's opinion is that the diary should be published after your father's decease [sic]." *Id.* Thus, Zhang Yuzhen was aware of Li Rui's different opinion from hers, i.e., that he wished to have his diaries published.

12

In a video recording of a November 27, 2010, conversation among Li Rui, Li Nanyang, and a woman from Fellows Press (identified as Woman 1 in the translation below), Li Rui explained that he had given Li Nanyang some of his materials and that she had compiled them into three books:

> Li Rui:  I will have to thank you for helping her publishing the book. Thank you.  The book, if not by her I cannot make it.
>
> Woman 1:  She is resourceful.  It's not easy for her.
>
> Li Rui:  You know that she is resourceful.  That's because of my help.
>
> Woman 1:  Oauh, you helped her.
>
> Li Rui:  Do you know why?
>
> Woman 1:  No.
>
> Li Rui:  After I was arrested in jail in Yan'an, the security bureau confiscated all my materials.  The man responsible for investigating me compiled all my writing, letters with her mother one by one with years labeled on them.  They were all compiled.  After my release he gave them back to me and I saved them.  Moreover I took them with me when leaving Yan'an and never destroyed them.  At Lushan Conference, I got into trouble  At Lushan Conference, I got into trouble they asked me what else toxic things did you write.  I gave them all my writings in the past, all the works saved in Yan'an.  All handed in.  I said, go ahead, that's who I am.  I returned to work in 1979 all my stuff from the past I handed them all I can't find them.  I can't find them.  All I got back was trivial belongings everything I wrote was nowhere to be found.  I became anxious.
>
> Woman 1:  Those materials were not put in your personal archive?
>
> Man 1:  Anyway, his archive . . . (inaudible)
>
> Li Rui:  The  notebook of Lushan Conference Record was also in it and it was missing.  I asked my secretary to look around.  Eventually in the basement of the Department of Water Resource and Electricity he found a locked safe cabinet.  When he opened it, all my materials were inside.
>
> Li Nanyang:  Yes.
>
> Li Rui:  I didn't have time to read, and gave her directly, most of them. She made use of these materials later and compiled into 3 books.

Tr. Exh. 101 (transcription and translation of November 27, 2010 video recording).  In another conversation that same day with Li Nanyang and Zhang Yuzhen, Li Rui said, "What I am worried

13

about now is that from what Xi Jinping said, all archives might be burned in the future." Tr. Exh. 102.

Between December 2009 and February 2014, installments of *Li Rui Oral History* were published on a monthly basis in *Zheng Ming* magazine in Hong Kong. *Li Rui Oral History* was published as a book by Great Mountain Publishing House in Hong Kong in July 2013.

Li Nanyang sent Li Rui copies of *Li Rui Oral History*, and Li Rui gave copies to his friends and visitors. Page 407 of *Li Rui Oral History* states, "Now it is hard for me to clearly recall those details when I was working at the Organization Department of the Chinese Communist Party, but I make diary entries almost every day. After my passing, let my daughter Nanyang sort them out." Page 407 of *Li Rui Oral History* (1st edition) [Ex. 106]; *see also* Li Nanyang Trial Tr. (day 2) 215:24-216:19.

Li Rui reviewed the manuscript of this page of *Li Rui Oral History* before it was published. He made corrections to other portions of the manuscript page that included what became page 407 of the book as published, but he did not make any corrections to the statement that he wanted Li Nanyang to sort out his diary entries. *See* manuscript of *Li Rui Oral History* [Ex. 107] at 334-35; *see also* Li Nanyang Trial Tr. (day 2) 220:3-221:4.

While working on and after finishing her work on *Li Rui Oral History*, Li Nanyang worked with her father to transcribe all of his diaries post-dating 1979. She would transcribe the diaries, and Li Rui would review the transcriptions and provide any corrections, which Li Nanyang would incorporate into the final draft.

On April 20, 2013, Li Rui wrote in his diary, "Xiaomei came in early morning and she is compiling my diary in whole. She found many illegible words and asked me to proofread them one by one." Tr. Exh. 108 (Li Rui's April 20, 2013 diary entry).

In November 2013, Li Rui gave Nanyang his keys and asked her to go around his apartment and collect his diaries. Zhang Yuzhen assisted Nanyang in this task. Li Rui wrote in his diary, "Nanyang will return to the United States today. She left me a list of the diaries that are taken away and the diaries that are still here. My handwritten works were found in my study, and the letters sent from others that had been organized[.]" Tr. Exh. 159.

On March 14, 2014, Li Nanyang wrote in her diary:

> I gave Laotou[4] The Centennial of Xinhai presented by Hoover.  He seems very interested, especially the section of Chiang Kai-shek's diary of appraising Song Qingling.  He also said: "It was Chiang's fault, he just wanted to kill all members of the CCP, otherwise, the CCP would have not fought him to the end.  So many CCP members were kill [sic] during his purge!"  I told him my visiting fellow position at Hoover, he was very happy.  He then asked me whether I had taken the Notes from Lushan Conference from the drawer.  I said no.  He responded: "Never mind."  I insisted on finding it, saying it was not in the drawer, rather, in a box.  Then I went to the study and found it.  Laotou said: "I have no idea you got a box to keep it."  I said: "It was you, you showed me this (treasure box) last time."  He then told me to put it somewhere in the study.  I put it upright in a short bookshelf by the left of the desk.  I thought it wouldn't be lost.  I tried to persuade him to let me take it back to the US and he wouldn't, saying he still need to review it again.  He mentioned that his letters can be given to the Hoover Institution.  I said I already did.  He also said: "About my diaries, those are also important, especially the ones written after 1982.  You need to compile them at Hoover."  I said: "For sure!"  We didn't talk about whether to take the diaries back to the US or not.  I thought it would depend on the appropriate timing and opportunity.

Tr. Exh. 122 (Li Nanyang's March 14, 2014 diary entry).  The Court credits Li Nanyang's account of this conversation.

### E.    The Confiscation of *Li Rui Oral History*

On October 29, 2013, Li Nanyang attempted to bring about 50 copies of *Li Rui Oral History* to China from Hong Kong, where the book had been published.  She was stopped at Customs at the Beijing Airport, and the books were confiscated by Chinese Customs officials.  *See* Li Nanyang Trial Tr. (day 1) 176:17-178:5.

That same day, Li Rui wrote in his diary, "A little past 4pm, Nanyang, Tizhong, Mangmang and Mangmang's husband came over unexpectedly, saying that three suitcases of Li Rui Oral History, 50 copies in total, were confiscated by the Customs.  Yuzhen wanted Nanyang to call Zhang Sizhi for help, as it is completely illegal to do so."  Tr. Exh. 110.

On October 31, 2013, Li Rui wrote in his diary, "Nanyang brought Attorney Xia Lin (introduced by Zhang Sizhi, from Huayi Law Firm in our city) and an assistant.  Customs believes

---

[4] "Laotou" was Li Nanyang's nickname for Li Rui.

United States District Court
Northern District of California

*Oral History* to be a 'banned book,' and so this is what they have been focusing on. They discussed it for a long time and did not stop until six o'clock. Hong Kong's *Ming Pao* devoted an entire page to this book by 'Li Rui's daughter.'"

Li Nanyang hired Xia Lin as her lawyer to work on her Customs case. Xia Lin was arrested shortly thereafter and has been imprisoned for more than a decade.

Li Nanyang filed a lawsuit in the Third Beijing Intermediary Court regarding the confiscation of the copies of *Li Rui Oral History*. The case was initially accepted but had been postponed 28 times since then as of the start of the trial in this case, and Li Nanyang has not been able to present her case.

On September 15, 2015, Li Rui wrote in his diary:

> Nanyang came in the afternoon and talked about the court situation: (1) The case has been going on for almost two years, which was indeed taking too long, and the court also wants to resolve the situation as soon as possible. The main issue is that it is complicated and difficult. (2) There have been no such cases in the past, only in 2003 there was a custom's seizure of the book How the Red Sun Rises. The Third Intermediate Court is a newly established court without experience in this kind of case, so caution is necessary. As soon as a judgment is made, it will become a "doctrine of precedents" for the future. (3) We also have not reached an internal consensus yet, we will forward your request of setting a trial date to the leader of the court as soon as possible. It will not drag on forever, but the date cannot be confined for you either. (4) Nanyang said: I told the judge that customs did not let me bring the books back to the United States and said that Li Rui's Oral History was a banned book that could not be brought into Mainland China. Li Rui had served as the secretary of Gao Gang, Chen Yun, and Mao Zedong; he was also in close contact with Hu Yaobang and Zhao Ziyang; this book is Li Rui's memoir about his experiences of following the Chinese Communist Party revolution in his entire life; the actions taken by customs damaged Li's reputation as well as my reputation, so I hope that the court would make a fair judgment. (5) Please trust that we will handle this matter with the utmost care and make a fair judgment.

Tr. Exh. 145 (Li Rui's September 15, 2015 diary entry).

### F.    Li Rui's Decision to Transfer the Li Materials to Stanford

Jiashu "Jason" Chen is the Executive Director of the Stanford Beijing Consulting Company. In Li Rui's oral history, which was published in Hong Kong, Li Rui stated that he kept a diary and that after he died, his daughter would take care of the diary. Chen read Li Rui's oral history and developed the idea that the Li Rui diaries could be donated to the Hoover Institution.

United States District Court
Northern District of California

Chen first met with Li Rui in November 2013.  Thereafter, he met with Li Rui four or five more times.  At some point in these meetings, he suggested to Li Rui, and also to Li Nanyang, that Li Rui donate his diaries to the Hoover Institution at Stanford University.

On March 1, 2015, Li Nanyang visited her father at his apartment.  Sometime prior to April 2015, Li Nanyang had a conversation with her father in which she told him that she had found all of his original diaries and that he should put them somewhere for safekeeping—not leave them on his desk, where anyone could grab them.  Li Rui agreed that she could take them, so she did.  He directed her to donate them to the Hoover Institution (although he used the word "give").  Zhang Yuzhen did not object to Li Nanyang taking the diaries.  In fact, she helped Li Nanyang locate and collect them.

In 2016, Li Rui published a statement saying, "Without my authorization, no one is allowed to issue and publish my diaries or use any part of the current diaries.  Violators will be subject to legal action.  Regarding the matters of issue and publication of the diaries, I will make separate arrangements before my life curtain falls."

On January 29, 2017, Li Nanyang visited a man named Du Daozheng and his family to discuss the possibility of him donating his materials to the Hoover Institution.  Three of Du's daughters supported a donation to Hoover, while one of his daughters was opposed to such a donation.  Later that day, Li Nanyang reported to Li Rui on her conversation with Du Daozheng and his family; Li Rui said that he wanted his original diaries to be donated to Hoover.  Li Rui wrote in his diary:

> Xiaomei came in the morning to discuss the diaries of DU and matters relating to the plan of handing over the diaries to Hoover Institution. Arrived at DU's family at ten o'clock.  Three of DU's daughters were for it and one against.  Hoover Institution asked her to seek opinions. She also has planned the same thing for my diaries.  The main reason is the deteriorating domestic situation.

Tr. Exh. 157 (Li Rui's January 29, 2017 diary entry).

On January 30, 2017, Li Rui composed a diary entry that read, in part,

> Woke up at 6:00.  Watched TV.  Nanyang returned early in the morning and discussed with Yuzhen about matters relating to the diaries.  Respected Mr. DU knows a lot of information and she

17

> agrees with my way to handle things, i.e. giving the diaries to Hoover Institution for archiving.

Tr. Exh. 158.

On February 3, 2017, Li Rui told Li Nanyang to take his original materials to the United States and directed her to donate them to Hoover.  Li Nanyang then collected the remaining original diaries and a few original meeting minutes notebooks.  Li Rui's February 3, 2017 diary entry reads, in part, "Nanyang will return to the United States today (her house is being remodeled).  Left me a list of the diaries that are taken away and the diaries are still here.  My handwritten works were found in my study, and the letters sent from others that had been organized.  Tr. Exh. 159.

On October 15, 2017, Li Rui wrote in his diary:

> Right after I finished my breakfast, [Li] Nanyang and [Ba] Tizhong came. . . .  We talked about their connections with the Hoover Institution Library and Archives at Stanford (I was there and the center keeps all the archives related to the "Cultural Revolution" and Chiang Kai-shek's diaries, among others, for the purpose of researching the significant figures in history), and its collection of my material.  They two have been busy with this important thing."

Tr. Exh. 170 (Li Rui's October 15, 2017 diary entry).

In November 2018, Nanyang visited her father in the hospital.

On January 29, 2019, Li Nanyang donated the Li Materials to the Hoover Institution.

Li Rui died on February 16, 2019.  U.F. ¶ 12.

On March 20, 2019, shortly after Li Rui's death, Laureen Schieron, the administrative assistant to the Director of the Hoover Institution, received an email purported to have been written by Zhang Yuzhen.  The email stated that Li Rui did not consent to make his diaries and other materials public and did not authorize Li Nanyang to dispose of his property. *Id.*  The email was written in the English language and originated from the email address LimsTim134@protonmail.com.  Jason Cheng testified that it is unlikely that Zhang Yuzhen actually authored this email, because she spoke only Chinese and did not speak, write, or read English.  R.T. 87:13-18.  The Court finds that Zhang Yuzhen did not write this email.

Zhang Yuzhen did not testify or otherwise appear at the trial.

United States District Court
Northern District of California

**G. Li Rui was Concerned that his Materials Would be Banned or Destroyed**

Based on his personal experience as a long-time member of the CCP, who himself had been imprisoned for expressing his views and whose works had been banned by the CCP, Li Rui was concerned that the Li Materials would be banned or destroyed by the Chinese government. This concern was the predominant reason he gave the Li Materials to Lin Nanyang for the purpose of transferring them to Hoover, as opposed to giving them to someone else or allowing them to remain in China, and is an important basis for the Court's ruling.

The Court received substantial evidence to support this concern. China banned Li Rui's books and other writings. For example, the record he made of the Lushan Meeting was published in 1989 but eventually banned in 2006. His book about the Three Gorges Dam Project was banned. Almost all his books were banned. Li Rui's diaries were kept by the Chinese National Library from 1946 to 2003, but Li Rui took them back in 2007. He knew that the National Library had previously burned a set of materials related to the Cultural Revolution, and he was worried that his diaries might meet the same fate.

As one example of Li Rui's concerns, in October 2007, Li Rui and Li Nanyang spoke in person. Li Rui stated that his diary was "the most valuable in my historical material especially after 1982." Tr. Exh. 91. He also stated, "You don't know when will archives in China be open to the public," and that "many of them had been burned." *Id.* He gave as an example that the "archives unfavorable of [sic] Zhou Enlai have all been burned." *Id.* As another example, in 2008, Li Nanyang caused her father's diaries from 1946 to 1979 to be published in the U.S. These were three volumes of transcriptions she had prepared. But the volumes could not be published in China because Li Rui was on the blacklist of the Chinese propaganda department.

For yet another example, in a video recording of a conversation among Li Rui, Li Nanyang, and others on October 19, 2013, Li Rui said that historical materials had been destroyed in China:

> Li Rui: If we need to study contemporary Chinese history, I'm afraid all the materials are stored abroad. There are classified materials of the Party about the Cultural Revolution. I heard that Peking University Library, Peking Library had a complete collection. I heard it was all burned. Those materials about the Cultural Revolution.

Man 1: Some of the materials about the Cultural Revolution were still kept by normal people.

Li Rui: Not complete enough.

Man 1: Incomplete, but most of them still exist. What I fear most is that the materials of the Party, the archives. We have no idea how many of them have been burned.

Li Rui: Now some materials were published in Hong Kong. I also received some pictures of the Cultural Revolution. They were two thick printed books.

Man 2: Some materials by Zhou Enlai and Deng Yingchao were also destroyed.

Li Nanyang: His diary mentioned it.

Li Rui: I have to say that, understanding the complete history of the Cultural Revolution would be a great feat.

Man 2: Many were burned in the early 1980s.

Man 3: When Hu Yaobang was still alive approximately 1000 or 2000 pieces were burned.

Tr. Exh. 114 (transcription and translation of October 19, 2013 video recording).

The testimony that Li Rui feared that his books would be banned or destroyed was unrebutted and was corroborated by other testimony about the practices of the CCP. For example, Zhang Yuzhen's expert witness Jacques DeLisle, who provided an opinion regarding the fairness of Chinese court proceedings, also testified that man of Li Rui's books are banned in China, were published outside of China but are not for sale in China, and "there are instances of people being stopped trying to bring them in." He further testified that the books of Professor Perry Link, an expert on Chinese literature and politics who testified for Stanford, are widely believed to be banned because of his role in the publication of some books that reflect badly on Mao Zedong. In those books, Professor Link was attempting to make available materials from Mao Zedong's personal physician, which did not reflect well on Mao, and materials related to the massacre at Tiananmen Square. Another of Zhang Yuzhen's experts, Professor Michael Palmer, acknowledged that the CCP restricts discussion of certain topics and that it is not possible to have a free and open discussion of those topics in China.

United States District Court
Northern District of California

20

United States District Court
Northern District of California

Professor Link also testified.  He stated that the Li Materials would not be made available to the general public if they were returned to China and that access to the materials would be tightly controlled by the CCP.  Professor Link also testified that transcriptions and copies of the Li Materials would be sufficient for purposes of general scholarship.  He opined, however, that if the Li Materials were sent to China, the CCP could use the originals to dispute the validity of any scholarship based on the transcriptions and copies by claiming that the originals said something different.

The Court finds Professor Link's testimony credible.  This testimony is relevant not because the Court is making a judgment as to whose possession of the Li Materials is "better." Instead, the testimony is relevant because it supports Li Rui's expressed concern that his writings would not be safe if they remained in the CCP.

These are merely a few examples.  The record contains numerous other examples of the CCP's censorship in the evidence summarized earlier in this order.

### H.    Agreements with Stanford University

Between 2014 and 2019, Li Nanyang executed several agreements with Stanford University related to the Li Materials.  These agreements placed the Li Materials or portions of them with the Hoover Institution under various conditions described in the agreements.

Over this same time period, in a succession of visits, Li Nanyang deposited the Li Materials with Stanford so they could be housed at the Hoover Institution. As of August 1, 2018, Li Nanyang had, on behalf of Li Rui, either deposited at or donated to Hoover all of the Li Materials and she no longer had any such materials in her possession.  On January 29, 2019, Li Nanyang signed a final Gift of Archives agreement with Stanford transferring ownership from Li Nanyang to Stanford of certain Li Manuscripts previously deposited with Stanford.

The various agreements do not uniformly support a finding that ownership of the materials described in them have been transferred to Stanford.  However, the testimony, emails, and other evidence received in this proceeding demonstrate that the intent of Li Rui, Li Nanyang, and Stanford was that the Li Materials be given to Stanford to be maintained at the Hoover Institution. Because the evidence of the parties' intent in this regard is overwhelming, any language to the

21

contrary in the Stanford agreements does not cast doubt on the conclusion that Stanford holds title to the Li Materials.

During this same time period, Li Nanyang received a series of one-year fellowships from Stanford to support her work in organizing, translating, and transferring the Li Materials. Because of these fellowships, Defendants have suggested that Li Nanyang's efforts to transfer the Li Materials to the Hoover Institute were motivated by money. The Court does not find this argument credible. Li Nanyang was motivated by her admiration for her father's work and her desire that his work be safely preserved for posterity. Furthermore, the amounts of money at issue were not substantial. Li Nanyang made a statement to Stanford official Eric Wakin that she was willing to finish transcribing her father's diaries and deliver them to Stanford even if her Stanford fellowship was discontinued. This statement showed that she was not motivated by Stanford's fellowship money. Therefore, the fact that she received such money does not undermine her credibility.

### I.      Claims by Fan Mao and Fan Miao

Fan Mao, Li Rui's younger daughter, stated at her deposition that she is entitled only to the materials written by her mother, Fan Yuanzhen. *See* Fan Mao Depo. Tr. (day 2) 81:14-22. Fan Mao does not claim ownership over any of the materials of Li Rui, nor does she claim that she inherited anything from him. *See id.* 59:4-11. She had no relationship with her father and had not spoken to him since she was nine years old; he was a "stranger" to her. *See id.* 56:1-4, 14-23.

Fan Yuanzhen's will provided that Fan Mao and Fan Miao were to inherit her "spiritual relics, such as photographs, written texts, tape recordings and video discs." *See* Tr. Exh. 279. However, the materials written by Fan Yuanzhen that are included in the Li Materials were in Li Rui's possession following their divorce, and Fan Yuanzhen's will makes no mention of any of her materials being in the possession of Li Rui or Li Nanyang. Further, decades before the instant dispute, Fan Yuanzhen sought and received certain letters from Li Rui.

Based on this record, the Court concludes that Li Rui owned the materials written by Fan Yuanzhen that he gave to Li Nanyang in the Trust Deed Letter. Tr. Exh. 77.

United States District Court
Northern District of California

United States District Court
Northern District of California

**J.      The Chinese Zhang Lawsuit**

**1.      Facts concerning the proceeding**

On March 20, 2019, Zhang Yuzhen sent a letter to Stanford, through her legal counsel in China, informing Stanford of her claim of ownership to the Li Manuscripts.

On April 2, 2019, Zhang Yuzhen filed an inheritance lawsuit in the Xicheng District People's Court of Beijing of the People's Republic of China (the "Zhang Action") seeking an adjudication of the ownership of the Li Manuscripts under Chinese law.  Zhang Yuzhen's Civil Complaint in the Zhang Action named Li Nanyang as a defendant, and "Hoover Institution on War Revolution and Peace, Stanford University" as a third party.

On April 4, 2019, a representative from the Chinese consulate in San Francisco delivered to Dr. Eric Wakin, Deputy Director of the Hoover Institution at Stanford, a letter from Zhang Yuzhen's attorney concerning the filing of the Zhang Action.  In this letter, Zhang Yuzhen's attorney in China, Zhang Jinpeng, informed Stanford that Zhang Yuzhen had filed an inheritance lawsuit against Li Nanyang on April 2, 2019, claiming ownership of the Li Manuscripts.

Between April 20, 2019 and July 23, 2019, counsel for Zhang Yuzhen and counsel for Stanford engaged in correspondence regarding the Zhang Action and the instant lawsuit filed by Stanford.

Li Nanyang was served with the complaint in the Zhang Action, and she responded by submitting two objections to the court's jurisdiction.  Other than these objections, Li Nanyang did not appear in the Zhang Action or send an attorney to appear on her behalf.

Between June 12, 2019 and June 18, 2019, Marlene Payes, a paralegal hired by Stanford, had multiple documents authenticated by the clerk of this Court, apostilled by the California Secretary of State, and/or legalized by the Chinese Consulate for submission to the court in the Zhang Action.

Attorneys Zheng Yanli and Kuang Yanbin of the JunHe law firm in Beijing were hired by Stanford to represent it in the Zhang Action.  These attorneys had several communications with court personnel in the PRC about the Zhang Action.

On June 20, 2019, Zheng Yanli and Kuang Yanbin each submitted to the Beijing Xicheng

People's Court documents purporting to be Powers of Attorney, authorizing each of them "as the attorney of Hoover Institution in the inheritance dispute between Zhang Yuzhen and Li Nanyang, Hoover Institution (as a third party)" and enumerating 14 ways in which they were authorized to act on behalf of their principal "The Hoover Institution on War, Revolution, and Peace."  They also sought to file an Application for Jurisdiction Objection and a List of Evidence.  All of these documents were apostilled by the California Secretary of State and legalized by the Chinese Consulate.

He also prepared a Third Party's Opinion that argued that Hoover was not a proper party to the inheritance dispute, but such document was not filed in the Zhang Action because the Chinese court did not permit Zheng Yanli and Kuang Yanbin to appear on behalf of the Hoover Institute.

On June 25, 2019, Zheng Yanli and Kuang Yanbin attended a hearing in the Zhang Action on behalf of The Hoover Institution on War, Revolution, and Peace.  Three judges—Presiding Judge Zhang Tao, Judge Yang Guilin, and Judge Wang Fan—presided over the hearing. Clerk Cai Xinyao was in attendance.  Zhang Yuzhen was represented by her attorney Zhang Jinping.  Zhang Jinping represented to the Chinese Court that Zhang Yuzhen was not in attendance.

During the hearing on June 25, 2019, the judges discussed the documents Zheng Yanli and Kuang Yanbin had sought to submit to the Court on behalf of The Hoover Institution on War, Revolution, and Peace.  The judges refused to recognize the validity and effectiveness of the notarized and legalized Powers of Attorneys issued by The Hoover Institution on War, Revolution, and Peace because Hoover's counsel had failed to submit Hoover's registration documents, as well as a certificate of a legal representative of Hoover.  The judges said that without these documents, the court was not sure whether: (a) Hoover had the capacity to independently participate in the proceeding; or (b) Zheng Yanli and Kuang Yanbin were duly authorized by Hoover to participate in the hearing.  The judges stated that they would not consider any of the submissions from The Hoover Institution on War, Revolution, and Peace until it had submitted its registration documents and the certificate of its legal representative.  The judges set July 25, 2019, as the deadline for submission of Hoover's registration documents and the certificate of its legal representative.

On July 12, 2019, the court clerk Cai Xinyao telephoned Zheng Yanli on behalf of the

court in the Zhang Action and asked about the progress of the notarization and legalization of the procedural documents.  Zheng Yanli told the clerk that she had not yet received the documents from The Hoover Institution on War, Revolution, and Peace, and the clerk asked her to attend an oral discussion with the judge explaining the preparation of the procedural documents.

On July 22, 2019, the court in the Zhang Action sent a notice of discussion to Zheng Yanli, requesting that she attend a discussion session on July 25, 2019.  Zheng Yanli and Kuang Yanbin attended the discussion session on July 25, 2019, as did Presiding Judge Zhang Tao and clerk Cai Xinyao.  Judge Zhang Tao asked whether Zheng Yanli and Kuang Yanbin had the procedural documents.  Judge Zhang stated that the procedural documents needed to be submitted before the court would accept any other documents or statements from counsel.  Judge Zhang asked whether Hoover wanted to continue attending the litigation proceedings and reiterated that Hoover would not be able to do so without submitting the procedural documents.

On November 20, 2019, the court in the Zhang Action issued a civil judgment (the "Zhang Judgment") (Ex. 201).  The Zhang Judgment awarded Zhang Yuzhen ownership of the Li Manuscripts and ordered Stanford and Hoover to transfer possession of the Li Manuscripts to Zhang Yuzhen within 30 days.  The Zhang Judgment is directed only at original manuscripts of Li Rui's.  It does not affect Stanford's possession of electronic or physical copies, transcriptions or materials not written by Li Rui.

The Zhang Judgment, in addition to naming as a "Third Party: The Hoover Institution on War, Revolution and Peace, Stanford University" named as a separate "Third Party: the Board of Trustees of the Leland Stanford Junior University."  The judgment states that neither the Hoover Institution, Stanford, nor Li Nanyang appeared at the trial without excuse for failure to do so.

Chinese law and rules of civil procedure allowed for an appeal of the Zhang Judgment.  The time for any appeal from the Zhang Judgment has expired, and Stanford did not seek review of the Zhang Judgment by the court in the Zhang Action or by any other judicial body in China.  The decision in the Zhang Judgment is final and not subject to any further appeal in China.

United States District Court
Northern District of California

25

**2.     Fairness of the Zhang proceeding**

A June 25, 2019 statement issued under Zhang Yuzhen's name "declare[d] that it is not my personal wish to file a lawsuit against Li Nanyang." Tr. Exh. 200. Li Nanyang testified that she is familiar with Zhang Yuzhen's signature, that the statement appeared to bear Zhang Yuzhen's signature, and that it was her understanding that the statement had been issued by Zhang Yuzhen. Furthermore, Zhang Yuzhen lacks the financial means to defendant this lawsuit in the United States or to prosecute the Zhang lawsuit in the PRC. From these facts, the Court concludes that she did not initiate the Zhang Lawsuit and she did not pay to defend the present lawsuit. The most likely source of funds for these litigations was the CCP.

Moreover, although brought in her name, the lawsuit was brought against Zhang Yuzhen's will. This is direct evidence of interference by the Chinese government in the lawsuit.

The Court heard testimony from Professor Thomas E. Kellogg. Professor Kellogg is the executive director of the Georgetown Center for Asian Law and is an adjunct professor of law at Georgetown University Law Center. He testified concerning China's legal system. The Court accepts Professor Kellogg's testimony as to the following matters:

- There is a scholarly consensus that the CCP fully controls the Chinese legal system. The CCP uses a number of different methods to assert influence and control over the courts. These mechanisms are duplicative and overlapping, so the CCP can choose which mechanisms to use in any particular case. First and foremost, the CCP makes it clear to the courts that they are subject to oversight and control and that they must not exercise judicial independence. The CCP also uses institutional bodies to exercise control. For example, the CCP utilizes Party Political-Legal Committees, which are CCP entities that are made up of judges, police officers, and prosecutors who meet regularly to determine how to handle the courts, from big-picture trends to decisions in specific cases. The CCP also uses Adjudication Committees, which are comprised of senior members of the court and have the power to review significant cases prior to the issuance of a verdict and to issue instructions to the judge handling the case, who will then incorporate those instructions into the verdict; as a result, any particular case may be decided by the Adjudication Committee, not the judge hearing the matter. Further, cases are generally heard by a panel of

judges, which is a way for the CCP to ensure that no single judge can act in a way contrary to its wishes.

• A Chinese court that reaches a certain judgment because of CCP influence does not acknowledge that influence in its ruling.

• The CCP does not dictate the decision in every single case. However, the system is designed so that the judges know their role and to ensure that the CCP can step in to dictate the decisions in specific cases it identifies as significant or political. There is no doubt that the CCP had the ability to interfere in, and dictate the result of, the Zhang Action.

• The Zhang Action is the type of case as to which the CCP would want to exercise its control over the legal system and to dictate the outcome. The CCP tightly controls information in China to support its version of history and the ideas it wants to promote. The Li Materials present a version of history that is different than the approved party narrative, and the CCP wants to prevent the public from being exposed to that version of history; the CCP also wants to deter others from donating similar materials to Western institutions.

• It is not possible to say which mechanisms have been used to dictate the outcome of a given case, due to a lack of transparency in China's legal and political systems. However, if one looks at the manner in which different elements of the Zhang Action were handled, one can see a clear effort to subvert Stanford's participation, which is evidence of party interference.

• Stanford made a substantial effort to appear in the Zhang Action. First, Stanford attempted to have several documents, including portions of Li Rui's diary, legalized by the Chinese Consulate for use in the Zhang Action. However, the Chinese Consulate refused to legalize certain of the documents. Second, Stanford hired Chinese counsel who made several attempts to appear on behalf of Hoover, but they were not allowed to appear. The stated reason for this was that Hoover did not present its registration documents. However, because Hoover is not a separate legal entity from Stanford, no such documents exist. This presented a Catch-22, in that Hoover could not appear to explain its legal status without providing the Beijing Court with documents that did not exist. The Beijing Court would not allow Stanford's counsel to explain this at a hearing, permitting only "yes" or "no" responses to its questions.

- This exclusion from participation in the Zhang Action is inconsistent with Chinese law. Article 56 of the Chinese Civil Procedure Code, as in effect at the time of the trial of the Zhang Action, gave third parties with an interest in a civil litigation the right to participate in that litigation. If a Third Party is not properly notified of the action, any judgment in that action is not enforceable against that Third Party. Further, such exclusion from participation in the Zhang Action is a crucial element that shows the CCP influenced the proceedings to dictate the outcome it wanted.

- Stanford was not added as a Third Party to the Zhang Action until the Zhang Judgment. This occurred even though the Beijing Court added other heirs and relatives of Li Rui as third parties earlier in the proceedings. The Zhang Judgment states that Stanford was summoned and added as a Third Party, but there is no evidence that Stanford ever received a summons. The Zhang Judgment further states that Hoover did not appear; it makes no mention of the attempts by counsel for Stanford to file powers of attorney and legal briefs on behalf of Hoover and to appear at hearings. Nor does the Zhang Judgment provide any rationale for the Beijing Court's refusal to allow such filings or appearances.

- Chinese law generally requires that court proceedings be open to the public and that the docket for court proceedings be available online. The hearings in the Zhang Action were not open to the public; instead, they were held in the section of the courthouse designated for criminal cases, and the courtroom was guarded by judicial police who kept individuals out of the proceedings. The court clerk noted that the case was being treated with great caution, signaling that the case was politically sensitive. Further, the docket and the papers filed in the Zhang Action are not available online. Court judgments in China are supposed to be available on the Chinese judiciary's website, but the Zhang Judgment is not available on that website.

- Under Chinese law, Stanford was entitled to take an appeal from the Zhang Judgment or to make a collateral attack on the Zhang Judgment. However, the number of appeals that succeed in general in China is "very low" and the number of successful appeals in "cases like this one where there is a political mandate from the Communist Party" is "zero."

- The Fan Mao Action shows the way in which Stanford could (and should) have been added as a Third Party in the Zhang Action. In the initial complaint in the Fan Mao Action, the only named Third Party was Hoover ("Hoover Institution on War Revolution and Peace, Stanford University, USA . . . 434 Galvez Mall, Stanford University, Stanford, CA"). Subsequently, an Application for Adding a Third Party was filed to add Stanford as a Third Party ("the Leland Stanford Junior University, California, USA . . . 450 Serra Mall Stanford, CA 94305").

- Stanford tried to participate in the Fan Mao Action, authenticating documents for filing in that lawsuit. Professor Kellogg noted that when Stanford's attorneys tried to participate in the Fan Mao Action, they were forcibly removed from the courtroom, and Stanford was not allowed to participate. Separate and apart from Professor Kellogg's testimony, the Court finds that this shows that Stanford's putative failure to comply with the document registration requirements in the Zhang Action was not the factual cause of its inability to appear in that action. The Chinese Courts did not intend to allow Stanford to participate regardless of those requirements.

- The essence of Professor Kellogg's testimony was that the proceedings in the Zhang Action did not satisfy international concepts of due process as to Stanford. Based on the facts set forth above, the Court reaches that legal conclusion below.

Zhang Yuzhen's expert, Jacques deLisle, agreed that "of course the Chinese Communist Party, or the party state, can, and sometime does, intervene in cases and can achieve the results it wants when it sufficiently is important, [and is] sufficiently energetic in doing that." He did not opine that the facts leading up to the entry of the Zhang Judgment were inconsistent with Chinese government interference and control. Rather, he stated, "I don't know for a fact what happened in this case." The Court finds that nothing in Professor deLisle's testimony is a basis to reject Professor Kellogg's testimony.

Although Professor Michael Palmer opined that the Zhang Judgment was valid, he also admitted that he had not read the diaries or any evidence in the case. He also admitted that Zhang Yuzhen had made statements that she did not want the diaries. He also acknowledged that it was

unusual that Stanford was added to the Zhang Judgment as a third party after the trial.  The Court considered Professor Palmer's testimony but found Professor Kellogg's testimony to be more credible.

### K.      Fan Mao's Inheritance Action

On May 20, 2019, Li Nanyang's sister Fan Mao filed a civil complaint ("Fan Mao Action") in the Beijing Dongcheng District People's Court (the "Dongcheng Court"), naming Li Nanyang as the Defendant and naming as a "Third Party" the "Hoover Institution on War Revolution and Peace, Stanford University, USA."  Fan Mao sought the return of "[a]ll the originals of the diaries, letters and written materials (1938-1949) of the deceased Fan Yuanzhen such as in the *Old Day Letters of my Parents* (Guangzhou, 2008) and *Yu Runquan Letters Collection* (Fort Worth, 2009)."

Stanford was not named as a "Third Party" in Fan Mao's initial complaint in the Fan Mao Action.  However, on July 29, 2019, Fan Mao filed an Application for Adding a Third Party, seeking to add "the Leland Stanford Junior University" as an additional Third Party.  On August 22, 2019, the Dongcheng Court filed a Notice of Participating in Legal Proceedings that was directed to both Hoover and Stanford.

### 1.      Stanford's attempts to participate in the Fan Mao Action

On November 12, 2019, Ms. Zheng and Ye Li of the JunHe law firm attended a hearing in the Fan Mao Action.  Ms. Zheng attempted to submit procedural documents to the court, including the requisite power of attorney documents authorizing JunHe to appear on Stanford's behalf, a notarized certificate of Stanford's legal representative, notarized copies of the legal representative's passport, and certified Chinese translations of those documents.  Nevertheless, upon reviewing those documents, the judge refused to allow Ms. Zheng and Ms. Ye to attend the hearing because the procedural documents had not been legalized by the Chinese Consulate.  Ms. Zheng explained to the court that the process of legalizing documents from the United States takes a long time, and that although that process was under way and would be completed soon, JunHe needed more time to complete that process.  When Ms. Zheng inquired about how the court had ruled on Stanford's jurisdictional objection and its application to delay the hearing, the judge

30

refused to provide any information and ordered Ms. Zheng and Ms. Ye to leave the courtroom. When Ms. Zheng and Ms. Ye continued to request an explanation, the judge ordered the court police to force them to leave the courtroom.

On November 13, 2019, Payes had the California Secretary of State's office apostille Powers of Attorney for Zheng Yanli (Leanne Zheng), Ye Li, and Deng Hanning dated November 1, 2019, along with a Stanford Certification of Board Resolutions dated November 11, 2019, a November 11, 2019 letter attaching a Certificate of Legal Representative dated November 11, 2019, a November 11, 2019 letter attaching an apostilled Application for Extension (Chinese version), a November 11, 2019 letter attaching a November 13, 2019 apostilled Application for Jurisdictional Objection (Chinese version), an Application Form of Consular Legalization of the Embassy/Consulate of the People's Republic of China, and a January 11, 2019 Copy Certification by Document Custodian Thomas Gilligan  attaching a passport page.

On November 14, 2019, Payes brought these documents to the Chinese Consulate in Los Angeles to have them legalized for use in the Fan Mao Action.  The Consular official resisted but ultimately accepted the documents.  Payes returned to the Chinese Consulate on November 19, 2019 to pick up the authenticated documents.

On November 19, 2019, Payes had Stanford's Certificate of Good Standing apostilled by the California Secretary of State's office, and the Chinese Consulate provided an authentication for that document on November 20, 2019.

On November 27, 2019, Payes had Stanford's Statement of Information apostilled, and the Chinese Consulate provided an authentication for that document the same day.

Payes also had copies of the pleadings from this action authenticated by the U.S. Department of Justice and sent to the U.S. Department of State.

Additionally, Payes provided an Application Form of Consular Legalization of the Embassy/Consulate of the People's Republic of China dated December 9, 2019 to the Chinese Consulate to get documents legalized, and she had a Statement of Michael Kreiner (an attorney for Stanford in the U.S.) swearing to the authenticity of court documents, dated December 5, 2019,

apostilled by the Secretary of State's office and legalized by the Chinese Consulate on December 11, 2019.

On December 18, 2019, Payes dropped off at the Chinese Consulate in Los Angeles for legalization: (a) a Statement of Information form and a Certificate of Good Standing for Stanford from the California Secretary of State's office; and (b) the statement from Li Nanyang authenticating certain pages from Li Rui's diaries that the Chinese Consulate had refused to legalize in June 2019 for use in the Zhang Action. Payes was told that the documents would be ready to be picked up on December 19, 2019. Later that day, Payes received a call from a clerk at the Consulate who said that the Consul General was refusing to authenticate the documents. The clerk said first that the documents needed to be authenticated at the San Francisco Consulate because Stanford is located in Northern California. The clerk then said that the Consul General remembered the case from the previous documents that Stanford had submitted for authentication and that the Consul General would not be authenticating the documents submitted on December 18, 2019. The clerk acknowledged that he had previously authenticated other documents for use by Stanford, but said that he could not do so anymore because the Consul General had instructed him not to do so. The clerk refused to give Payes a reason for the refusal, and he declined Payes' request for a written reason for the refusal, instead stating that he had been instructed to tell Payes this and that he could not say anything more. The clerk refused to allow Payes to speak with the Consul General or to give Payes his name. Payes has never had a consulate reject documents without providing a reason for the rejection.

The actions and inactions of Chinese diplomatic personnel are further evidence of the CCP's interest in, and attempts to control, the disposition of the Li Rui Materials.

### 2.     The judgment in the Fan Mao Action

On December 10, 2019, the Dongcheng Court issued a judgment in the Fan Mao Action (the "Fan Mao Judgment") ordering that the "originals of all personal diaries of the deceased Fan Yuanzhen, letters written by Li Rui and others to Fan Yuanzhen, and other written materials of Fan Yuanzhen to be inherited by the plaintiffs Fan Mao and Fan Miao" and that Hoover and Stanford were to return those materials to Fan Mao.

The Fan Mao Judgment stated that both Stanford and Hoover "did not appear in court without good cause upon subpoenaed [*sic*] by this court." As discussed above, however, Stanford and Hoover did appear in court.

The Fan Mao Judgment did not acknowledge or address the attempts by Stanford's counsel to appear in court and to submit procedural documents on November 12, 2019, nor did it explain the Dongcheng Court's justification for refusing to allow Stanford's counsel to appear in court. Nor did it explain or seek to justify the Dongcheng Court's refusal to allow Stanford's counsel the time that they requested to get documents legalized for submission to that court.

At the time that the Dongcheng Court filed the Fan Mao Judgment, Payes was still in the process of trying to get documents legalized for filing in the Fan Mao Action.

## III.   CONCLUSIONS OF LAW

### A.   The Zhang Judgment Is Not Enforceable

#### 1.   Governing Law

"There is currently no federal statute governing recognition of foreign judgments in the federal courts." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1212 (9th Cir. 2006). "Generally, the recognition of foreign judgments is an issue of state law." *Chenco Eng'g & Consulting GmbH v. Do-Fluoride New Materials Co.*, No. 2:24-CV-00632-AKB, 2025 WL 2430556, at *7 (D. Idaho Aug. 22, 2025) (citing Restatement (Third) of the Foreign Relations Law of the United States § 481 cmt. a. (1987) ("[R]ecognition and enforcement of foreign country judgments is a matter of State law, and an action to enforce a foreign country judgment is not an action arising under the laws of the United States. Thus, State courts, and federal courts applying State law, recognize and enforce foreign country judgments without reference to federal rules.")). "In matters not involving money judgments, California courts "look to general principles of comity followed by the California courts[.]" *Id.* at 1213-14.[5]

"Comity is 'the recognition which one nation allows within its territory to the legislative,

---

[5] If a foreign money judgment were at issue, it would be governed by California's Uniform Foreign-Country Money Judgments Recognition Act, Cal. Civ. Proc. Code §§ 1713–1724. The Zhang Judgment is not a money judgment.

executive or judicial acts of another nation.'" *Asvesta v. Petroutsas*, 580 F.3d 1000, 1010–11 (9th Cir. 2009) (quoting *Dependable Highway Express, Inc. v. Navigators Ins. Co.,* 498 F.3d 1059, 1067 (9th Cir.2007)).  "Extension of comity to a foreign judgment is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id.* (citation modified).  A federal court should generally give preclusive effect to a foreign court's finding as a matter of comity."  *Shayefar v. Kaleleiki*, No. CV 14-00322 HG-KSC, 2015 WL 9412111, at *10 (D. Haw. Dec. 22, 2015), *aff'd*, 698 F. App'x 467 (9th Cir. 2017).  However, "[c]omity is not an inexorable command, and a request for recognition of a foreign judgment may be rebuffed on any number of grounds."  *MacArthur v. San Juan Cnty.*, 497 F.3d 1057, 1067 (10th Cir. 2007) (citation modified).

Courts applying California law generally consider the criteria established in *Hilton v. Guyot*, 159 U.S. 113 (1895) and those provided in the Restatement (Third) of Foreign Relations Law as appropriate sources of law for recognition of foreign judgments.  *See Yahoo! Inc.*, 433 F.3d at 1214 ("We may appropriately consult the Restatement . . . ."); *see also Asvesta*, 580 F.3d at 1011 ("*Hilton* provides the guiding principles of comity") (quoting *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir. 1997)); *Wilson*, 172 F.3d at 810 ("*Hilton* and the Restatement (Third) provide sound guidance for assessing legal judgments of other nations.").

In *Hilton*, the United States Supreme Court stated that a judgment of a foreign court should generally be recognized if there has been: (a) opportunity for a full and fair trial abroad; (b) trial before a court of competent jurisdiction; (c) trial conducted upon regular proceedings; (d) trial after due citation or voluntary appearance of the defendant; (e) trial under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries; and (f) no evidence of fraud or prejudice in the court or in the system of laws under which the court was sitting or for any other special reason why the comity should not allow the foreign judgment full effect.  *See Hilton*, 159 U.S. at 202–03 (emphasis added).

Similarly, Section 482 of the Restatement (Third) of Foreign Relations Law identifies two mandatory and six discretionary grounds for non-recognition of foreign judgments:

34

(1)  A court in the United States may not recognize a judgment of the court of a foreign state if:

(a)  the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law; or

(b)  the court that rendered the judgment did not have jurisdiction over the defendant in accordance with the law of the rendering state and with the rules set forth in § 421.

(2)  A court in the United States need not recognize a judgment of the court of a foreign state if:

(a)  the court that rendered the judgment did not have jurisdiction of the subject matter of the action;

(b)  the defendant did not receive notice of the proceedings in sufficient time to enable him to defend;

(c)  the judgment was obtained by fraud;

(d)  the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought;

(e)  the judgment conflicts with another final judgment that is entitled to recognition; or

(f)  the proceeding in the foreign court was contrary to an agreement between the parties to submit the controversy on which the judgment is based to another forum.

Restatement (Third) of Foreign Relations Law § 482 (emphasis added).

### 2.   Application

Applying these principles, the Court concludes that the Zhang Judgment is not enforceable, for the following reasons.

First, the Beijing Court lacked jurisdiction over Stanford because it was not originally named as a party in Zhang Yuzhen's civil complaint.  Rather, it was added as a third party for the first time in the Zhang Judgment.  "It is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee,* 311 U.S. 32, 40 (1940)).  "This rule is part of our 'deep-rooted historic tradition that everyone should have his own day in court.'" *Martin v. Wilks*, 490 U.S. 755, 762 (1989) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal

Practice and Procedure § 4449, p. 417 (1981)). That the Beijing Court added Stanford *post hoc* shows that court knew that Stanford had not been properly before it while the proceedings were ongoing and that its judgment would not be binding on Stanford unless Stanford were added after the fact.

That service may have been effected on "Hoover Institution on War Revolution and Peace, Stanford University" does not change this conclusion. As the Zhang Judgment itself recognizes, Hoover and Stanford are separate parties. Service on Hoover, even if its name included a reference to Stanford, is not service on Stanford. *See Franco v. Dow Chem. Co.*, No. CV 03-5094 NM (PJWX), 2003 WL 24288299, at *5 (C.D. Cal. Oct. 20, 2003) (service on "Dole Food Corporation Inc." not equivalent to service on "Dole Food Company, Inc."). It appears that the Zhang Court also did not think service was effected on Stanford; if it had, it would have allowed Stanford's lawyer to appear.

Second, even if the Beijing Court had personal jurisdiction over Stanford, Stanford was denied an opportunity to appear and defend itself in the Zhang Action because the Beijing Court would not allow Stanford's lawyers to appear, despite their substantial efforts to do so. A well-established principle of comity is that "it would be unjust to [a sovereign's] own citizens to give effect to the judgments of a foreign tribunal against them when they had no opportunity of being heard." *Grover & Baker Sewing-Mach. Co. v. Radcliffe*, 137 U.S. 287, 297 (1890). Such was the case here.

*DeJoria v. Maghreb Petroleum* is instructive. In that case, Plaintiff DeJoria sought a declaration that a judgment of the court in Morocco was invalid because, among other reasons, DeJoria had not been able to participate in the litigation leading to the judgment. *DeJoria v. Maghreb Petroleum Expl., S.A.*, No. A-13-CV-654-RP-AWA, 2018 WL 1057029, at *15 (W.D. Tex. Feb. 26, 2018), *report and recommendation adopted*, No. 1:13-CV-654-RP, 2018 WL 1830789 (W.D. Tex. Mar. 28, 2018), *aff'd*, 935 F.3d 381 (5th Cir. 2019). The Court found that DeJoria had a legitimate fear of traveling to Morocco based on threats made against him by persons connected with his litigation opponents, who were also members of the royal family. *Id.* He also was not able to retain counsel, "due to the fact that he was a defendant in a case that was

36

of great political interest to the King of Morocco, and his interests were adverse to the King's." *Id.* These facts and others compelled the *DeJoria* court to find that "the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." *Id.* at *19 (quoting the Texas Uniform Foreign–Country Money Judgments Recognition Act). Here, although Stanford was able to retain counsel, that counsel was not able to participate in the litigation and its views were not considered by the court. This meant that Stanford did not receive due process.[6]

Third, the Beijing Court failed to keep the "clear and formal record" of the proceedings that would allow this Court to find that the proceedings were fair. *See Hilton*, 159 U.S. at 205–06 (listing as one of the requirements for a judgment entitled to deference that the court's "proceedings . . . are stated in a clear and formal record"). The proceedings were closed to the public; the court's website does not list any information about the Zhang Action; and the Chinese judiciary's official verdicts database, China Judgments Online, does not contain any information about the Zhang Action, including the Zhang Judgment. *See In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 879 (Bankr. S.D.N.Y. 2021). The absence of a written record makes it impossible to determine whether and to what extent that record supports the Zhang Judgment. In at least one respect, the judgment is at odds with the facts, stating that Hoover, Stanford, and Li Nanyang were "summoned by the court and did not appear, with no justified reason" and "did not present any statements, either." In actual fact, however, Hoover had attempted to appear through Stanford's counsel and to present evidence and argument and Li Nanyang had presented jurisdictional objections. Because there is no "clear and formal record," the Court cannot determine whether the proceedings afforded Stanford the due process to which it was entitled, or satisfied the other *Hilton* factors.

Fourth, there is evidence that this particular proceeding before the Beijing Court was

---

[6] Zhang Yuzhen contends that "Stanford was fully able to submit to the Chinese court both a proof of its existence as a legal entity as well as evidence of its decision to retain the JunHe firm to represent it." ECF No. 179 ¶ 56. But Stanford was not a party to the proceeding until it was added after the fact, and Zhang does not explain how a non-party would have the right to submit anything to the Chinese court.

37

dominated by the CCP, as summarized by Professor Kellogg. *See Wilson v. Marchington*, 127 F.3d 805, 811 (9th Cir. 1997). Both *Hilton* and the Restatement (Third) of Foreign Relations Law permit denial of enforcement of a foreign judgment when the foreign judicial system from which the judgment originated did not provide an impartial tribunal or due process of law in a particular case. Evidence "that the judiciary was dominated by the political branches of government or by an opposing litigant, or that a party was unable to obtain counsel, to secure documents or attendance of witnesses, or to have access to appeal or review, would support a conclusion that the legal system was one whose judgments are not entitled to recognition." *Wilson*, 127 F.3d at 811 (citing Restatement (Third) of Foreign Relations Law § 482 cmt. b).

The State Department Country Reports on Human Rights Practices "ha[ve] been described as the most appropriate and perhaps the best resource for information on political situations in foreign nations." *Kazlauskas v. I.N.S.*, 46 F.3d 902, 906 (9th Cir. 1995). The U.S. State Department Country Report on Human Rights Practices in China for 2019 states:

> Although the law states the courts shall exercise judicial power independently, without interference from administrative organs, social organizations, and individuals, the judiciary did not exercise judicial power independently. Judges regularly received political guidance on pending cases, including instructions on how to rule, from both the government and the CCP, particularly in politically sensitive cases.

Department of State China 2019 Human Rights Report, Tr. Exh. 310 at 14. Professor Kellogg's expert report notes that "[p]arty control over the judiciary is well-documented . . . . The State Department's findings on judicial independence remain unchanged: its reports on China have continued to note the judiciary's lack of judicial independence on an annual basis each year, including 2023, the most recent report currently available."

The fact that the proceedings in the Zhang Action were unfair as to Stanford demonstrates that such proceedings were unfair as to Li Nanyang.

For all these reasons, the Court finds that the Zhang Judgment is not entitled to recognition in this Court. The Court therefore turns to the ownership of the Li Rui Materials.

United States District Court
Northern District of California

**B.      Li Rui Gave The Li Materials to Li Nanyang for the Purpose of Removing Them from China and Donating Them to Stanford**

The Court finds that Li Rui gave the Li Rui materials to Li Nanyang for the purpose of removing them from China and donating them to the Hoover Center at Stanford.  Thus, when Li Nanyang donated the materials to the Hoover Institute, she was acting in accordance with and pursuant to Li Rui's expressed wishes.  Accordingly, Stanford now holds good title to the Li Rui Materials.

Li Rui knew that Stanford would preserve the Li Materials and make them available to the public.  He also believed that the CCP was likely to secrete, censor, redact, or destroy the Li Materials.  His desire that his writings be made available to the public in perpetuity and not be censored in any way was the primary motivation for giving the materials to Li Nanyang so she could deposit them at Stanford/Hoover.  Li Rui's fears that his writings would be banned, burned, or otherwise made unavailable were reasonable and consistent with other evidence received in the case as set forth above.

Because Li Rui gave the materials to Li Nanyang for this purpose prior to his death, the materials were not part of his estate at the time of his death and therefore were not subject to the law of inheritance.

While some of the diary entries and verbal remarks made by Li Rui are ambiguous, the only sensible reading of these communications in their entirety is that Li Rui gave the Li Materials to Li Nanyang with the intent that they be donated to the Hoover Institution.  Notably, there are no diary entries, verbal remarks, or other writings manifesting a desire by Li Rui to take a different course of action.

Tellingly, Zhang Yuzhen elected neither to testify live nor to present deposition or other written testimony.  Zhang Yuzhen's failure to offer her own testimony at trial, notwithstanding her counsel's ability to procure her testimony through questioning by a Chinese court, supports an inference that her testimony would have been unfavorable to her case.  *Sparkman v. Comm'r*, 509 F.3d 1149, 1155 & n.5 (9th Cir. 2007).

Zhang Yuzhen contends that Li Rui stated in an October 11, 2010 conversation "that the decision to publish his diaries should rest, after his death, with Zhang Yuzhen."  ECF No. 179

¶ 93.  The evidence does not support that contention.  In fact, Li made only the general statement about Zhang that "she is the decision maker of the household."  Tr. Ex. 327 at STAN00087791.  And in the same conversation, Zhang disclaimed any desire or capability to be the person who published Li's diaries.  *Id.* ("I've been thinking this way about this diary, and I've been thinking the same way about this thing.  I definitely don't want it.  I also don't have the skills.  Honestly, if you give it to me, I don't have the skills, I can't organize it, so I also can't help you in this matter.").

Defendants also argued that Li Rui's transfer of the Li Rue Materials to Li Nanyang for the purpose of donating them to the Hoover Institution was ineffective because that transaction was not accompanied by a "juristic act."  As Zhang's counsel acknowledged during closing argument, it was not required that there be a writing for Li Rui's gift of the Li Rui Materials—which was for the purpose of donating the materials to the Hoover Institute—to be effective.

There were so many conversations between Li Rui and Li Nanyang regarding his diaries that Li Nanyang must have had an accurate understanding of Li Rui's wishes regarding the Li Materials.  To find in favor of the Defendant would require the Court to conclude that Li Nanyang consciously and intentionally acted against Li Rui's wishes.  There is no support in the evidence for such a conclusion.

Xi Qing testified by deposition that he prepared a draft will at Li Rui's request in 2015.  Li Rui purportedly asked the will to be prepared because "Li Nanyang had stolen his diaries and taken the diaries to the United States."  The transcription of the unsigned draft will included in Xi's statement provided that Li Rui did not want any of his offspring to participate in the publication of his diaries and that the executive team who drafted the will should determine, with the consent of Zhang Yuzhen, who would publish Li Rui's diaries.  Xi Qing's testimony was not credible.  Li Rui makes no mention of this draft will in his diaries, nor do his diaries mention any efforts he made to have Li Nanyang return the diaries to him.  Furthermore, the draft will and the testimony of Xi Qing are directly contradicted by Li Rui's numerous statements that he wished Li Nanyang to be responsible for his diaries, that he was aware of and consented to her having taken them, and that he wished her to give them to the Hoover Institution.

40

Xi testified to other alleged statements by Li Rui that could not have been made.  For example, when shown at deposition the Trust Deed Letter written and signed by Li Rui, Xi testified that Li Rui would never have signed the Trust Deed Letter and that "the content of this note is something that was denied by Li Rui repeatedly."  Because it is an undisputed fact that Li Rui did, in fact, sign the Trust Deed Letter, the Court finds that Li never made such a statement and that the testimony of Xi Qing should be disregarded.

**CONCLUSION**

For the reasons set forth above, the Court declines to enforce the Zhang Judgment and finds in favor of Stanford on its quiet title claims.  Because Li Nanyang's possession and donation of the Li Materials was lawful and in accordance with Li Rui's wishes, the Court finds against Zhang Yuzhen on her claims for conversion, aiding and abetting conversion, and civil conspiracy.  In all other respects, the Court finds in favor of Plaintiff and against Counterclaimant.  Stanford shall submit a proposed form of judgment, approved by all parties as to form, within 14 days of this order.

**IT IS SO ORDERED.**

Dated:  March 31, 2026

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

41